**THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

| |
|---|
| United States of America, |
| *v.* |
| John Doe, |
| *v.* |
| Richard Roe, |

**10-cr-2905**

Frap 48
Proceeding
17-mc-1302 EDNY

(Chen, Master)

**Affirmation and Memorandum of Law Submitted in
Behalf of Movant / Appellant Frederick M. Oberlander**

**In Support of C. Collins' Letter Motion (ECF 31) and in Support
of His Own Motion for Emergency Declaratory and Related
Relief Including a Declaration that any Aspect of any Purported
Order of This Court in any Way Restricting or Exposing to
Sanction His Right to Disseminate Any or All of the Content of
ECF 27 and ECF 28 or the Fact of Their Filing Here is
Transparently Invalid if not Illegal**

Richard E. Lerner, Esq.
**The Law Office of Richard E. Lerner**
122 West 27th Street, 10th Floor
New York, New York 10001
Tel. 917.584.4864
richardlerner@msn.com

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   The Monday, June 19, 2017 oral argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   The subsequent submissions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   There is no duty to assume, or assure, that a court properly put anything under
   seal or otherwise ordered restrictions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   The Constitutional Invalidity of Sealing ECF 28 as Was Done Here is
   Pellucidly, if not Astonishingly, Clear. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      *Gag orders are prior restraints so cannot be imposed without a panoply
      of procedural and substantive constitutional due process.* . . . . . . . . . . . . . . . . . . *8*

      *The illegality, invalidity, and transparent invalidity of the "sealing"* . . . . . . . . . . . *12*

      *An example of the constitutional dilemma* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *13*

   The judiciary should, and must, accept criticism with humility and grace . . . . . . . . . 16

   A "constitutional conscience" is needed indeed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   Four freedoms are threatened by this court's acts, freedoms that belong to the
   people, not the court, freedoms which demand this court reverse itself and
   repair its constitutional insult: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cases

*Ashcraft v. Conoco, Inc.*, 218 F. 3d 288 (4th Cir. 2000) ............................................13

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ................................................. 9

*Caperton v. AT Massey Coal Co., Inc.*, 556 U.S. 868 (2009) ....................................19

*Ex Parte Steinman and Hensel*, 95 Pa. 220 (1880) ................................................... 23

*Howat v. State of Kansas*, 258 U.S. 181 (1922) ........................................................10

*Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996) ..................15

*United States v. Salameh*, 992 F. 2d 445 (2d Cir. 1993) ........................................... 8

*Walker v. Birmingham*, 388 U.S. 307 (1967) ............................................................10

*Zyprexa Litigation*, 07-CV-05014 (E.D.N.Y. 2007) ..................................................14

**Other Authorities**

"Torture Memos: The Case Against the Lawyers," David Cole, *New York Review of Books*, 2009 ......................................................................................................... 23

# Introduction

Appellant Frederick Oberlander submits this memorandum in support of the letter application submitted by journalist C. Collins, *pro se*,[1] and in in support of his own request for emergency relief – specifically, a declaration that to the extent any order of this court, but for such relief, could be enforced against him if he disseminates any of the content of the documents filed as ECF 27 & ECF 28, including the fact of their filing, to any person, for any reason, such order is unconstitutional, unlawful, or both, *ab initio*, and shall not be enforced.

As set forth more fully below, to the extent there even are any orders extant possibly having such decretal effect, they are fatally flawed procedurally and substantively. Therefore, by the doctrine of transparent invalidity Mr. Oberlander has the standing to seek relief. Moreover, even if there are no such orders in force, Mr. Oberlander is sufficiently chilled by the possibility that they may in the future be claimed to have existed today to give him standing.

Last, Mr. Oberlander claims procedural and substantive First Amendment rights equal, if not superior, to any member of the media, including the right to be heard on an emergency basis by the "hot news" doctrine that says that even a temporary impedance in the publication of news is an intolerable constitutional infringement. *Citizens United* is but the latest in a line of cases making clear that

---

[1] Mr. Oberlander adopts the arguments submitted by C. Collins.

1

organized media have no privileges beyond those of natural persons. To the extent caselaw in this circuit says otherwise, it is rejected as insupportable outlier juridics.

One of the documents that this court put entirely under seal, or at least took away from public access, is a motion that was submitted in behalf of Mr. Oberlander at the U.S. Supreme Court (ECF 28-1). It was submitted to the Supreme Court, and made public by the Supreme Court. It remains publicly available from the Library of Congress, and the National Archives, which will provide a copy to anyone who asks from $20. Thus, any restriction on its public access or Mr. Oberlander's right to disseminate it is insupportable, indeed inexplicable.

It is also public on one of this court's own dockets, 16-MC-706, ECF 109-1 and 191-5. It was made public by Judge Cogan at the insistence of Mr. Oberlander, who proved that the motion had been ordered public by the Supreme Court and was available at the National Archives. The proof was submitted to Judge Cogan because Mr. Sater's counsel had made the same misrepresentations to him as he made to this court; *viz.*, that Mr. Oberlander and counsel were lying about the submission of the motion to the Supreme Court, and that the Supreme Court hadn't allowed publication of information from the PSR. Any restrictions on dissemination of that motion by virtue of its "sealing" by this court would not only be inexplicable but, respectfully, suspicious, especially in light of the fact that this court has been presented proof that Mr. Sater was lying about the lack of motion, the lack of fair disclosure, the lack of notice, and the lack of opportunity to object at the Supreme Court.

# Background

**The Monday, June 19, 2017 oral argument**

On Monday, June 19, 2017, this court heard argument in open court on unsealing the documents on the docket of this case, and on the master's docket as captioned above. Forbes Media LLC and reporter Richard Behar, *via* the Yale Law School Floyd Abrams First Amendment clinic, asserted that the PSR must be unsealed as the facts of this case (including President Trump's involvement) demand it, even if *Charmer* controls; and in the facts of this case, *Charmer* does not, as it the PSR is not serving as a PSR but as an underlying *res* of the unsealing or "ungagging."

Mr. Oberlander said the question of the public's right of access to the PSR was moot because in granting a motion he had filed before the Supreme Court in 2012 in connection with his petition for writ of certiorari, that Court had ruled that substantial material in the PSR was of such public concern that it overwhelmed any countervailing interest, by *Charmer* or normal access standards, and had given leave for him to make such public in a redacted version of his petition, which he did.

Mr. Sater, by Mr. Wolf, asserted there had been no such motion filed at the Supreme Court and that Mr. Oberlander and counsel had defrauded that Court, and were defrauding this court by representing the contrary, that no other parties had been notified of such motion and had never filed any papers or been heard in opposition, and that "every court" before which they had tried that fraud had seen through it and said "nothing from the PSR." The government said, in sum, that it wasn't sure.

3

The court suggested that as a matter of policy perhaps it had to withhold crucial PSR information from the public as the public would not have known of it but for Mr. Oberlander's initial disclosure of it, so the public's First Amendment rights would be sacrificed for the greater good of preserving the right of the courts to keep their affairs secret, even when they should not or need not, as the Supreme Court agreed when it gave Mr. Oberlander leave to tell the content of the PSR to the world.

The court also suggested that it could say that the Supreme Court filings before it, which quoted substantially from the PSR and which were indisputably public, were not necessarily really from the PSR because it was only Mr. Oberlander's statement that they were and such statements might not be true.

Mr. Oberlander countered, in sum, that the Supreme Court had called for the responses of the Solicitor General and Mr. Sater and that while the petition which they were opposing represented that it contained information taken from the PSR, neither of them ] ever refuted that, though the rules of the Supreme Court placed the burden on them to deny such factual representations if they believed them to be false.

Yale then, with the court's permission, read into the record the entirety of both Mr. Oberlander's representations in his Supreme Court petition of certain PSR content as well as the government's representations of other PSR content in their opposition papers. (The court expressed no thought that perhaps it should also decide that the government's representations that it was quoting PSR content were merely its own word and also not necessarily true.)

4

**The subsequent submissions.**

On June 20, 2017, the court invited briefing on *Charmer*'s applicability. On June 22, 2017, Yale submitted a brief arguing as it had in the hearing and noting that *Charmer* was wrongly decided as a PSR is obviously a judicial document as it aids in sentencing but the court need not reach the issue because it was not really a "PSR" *qua* PSR, but a *res gestae*. Yale claimed to be filing it under seal by directive of this court, but there is none, and objected to doing so on the ground there was no need.

On, June 24, 2017, Mr. Oberlander efiled on this docket a brief and exhibits arguing in support of unsealing appellee Mr. Sater's 2004 PSR. See ECFs 28, 28-1, 28-2. He did not file under seal, because there was neither order nor intrinsic reason to. Included among his arguments and filings was irrefutable proof:

- That he had fully informed the Supreme Court by motion – properly served on all parties by the appellate printer – that he proposed to make public information from the PSR in the public cert petition.

- That this would require the Supreme Court to vitiate the holding of the Second Circuit that he could not.

- That he cited by page directly to the PSR in the Joint Appendix before this very court to verify that what he was disclosing did come from there.

- That he submitted drafts for review by the Supreme Court before that Court approved his final version.

- That that version was also served on all the parties.

- That none of the parties ever objected.

- That because his filing had been sworn to under penalty of perjury by counsel, as well as prior reasons, this court was powerless to second-guess anything that happened at the Supreme Court and was required to recognize that the right of the public to have maximum access to the PSR to further the ends of justice, exactly the language to which the Supreme Court acceded, is thus law of the case that this court must follow.

No party, not Mr. Sater and not the government, has objected to this content. One may presume they would not dare. So, members of the public should have been able to click on, read, and download the Yale and Oberlander filings, and apparently some did, including journalists reporting for global media, as established by the letter of C. Collins, which this court has placed on the public docket. ECF 31.

Subsequently to the filing, the ECF 28 documents became inaccessible to the public, even though some already has them, *supra*. But clicking on their Pacer links today shows, instead of a download page, that they're "sealed." Yet the docket shows no sealing order, or other indication they were "sealed" by lawful court order. Only by clicking the links would one know they are "sealed," assuming that is the case.

As indicated above, we understand from C. Collins' July 7, 2017 letter sent to all counsel, and now docketed by the court, that it has been download by the media. Indeed, another journalist (who wishes to not be identified) has also advised me that he downloaded my June 24th memorandum from Pacer.

## Argument

**There is no duty to assume, or assure, that a court properly put anything under seal or otherwise ordered restrictions.**

As noted, Mr. Oberlander's June 24, 2017 filing in support of unsealing the PSR, ECF 28, now shows "sealed " when accessed through Pacer, so for this motion he assumes that as far as Pacer is concerned all of the documents have been put under seal, and not by clerical or computer mistake, but by human intervention, one which should have been lawfully authorized by the court.

Yet there is no requirement that Mr. Oberlander assume that they were put under seal pursuant to a valid and lawful order of this court, especially where, as here, it is self-evident that that has not occurred.

For one thing, there would have to be a written, docketed, signed order issued after public notice and hearing not only sealing it but also explaining by reasoned decision based on clear-and-convincing record evidence, why sealing was the least restrictive means necessary *and effective* to achieve a specified compelling interest.

That would be a singularly hard thing to do in the case of ECF 28-1, the motion counsel filed with the Supreme Court in 2012 which (1) that Court *ordered* public in 2012; (2) Court *made* public at its clerk's office in 2012; and (3) which has *been* public ever since, (a) physically available at the National Archives (which will send anyone a copy for $20), and (b) available online not only at several websites, including one maintained by one of the amici, Mr. Dan Wise, *but also on Pacer <u>on one of your honor's own dockets</u>, 16-MC-706 (PKC), as both ECF 109-5 and ECF 191-1.* Thus, sealing that document is the ultimate *ultra vires* act.

Respectfully, perhaps this court feels that expedience lets it disregard vertical *stare decisis* to seal a document that was *ordered* public (not *allowed* public, **ordered** public) by the Supreme Court, thus disregard the right, indeed **compelling necessity**, of access to it made law of the case by that Court. If so, then Mr. Oberlander submits that such expedience is not merely unconstitutional, but unlawful.

7

Mr. Oberlander submits that that "sealing" alone is chilling, an implicit threat that if he tells what ECF 28-1 says he can be charged with contempt, sanctioned, or referred for discipline, despite that it is public by order of the Supreme Court.

Respectfully, from the view of a well-informed disinterested observer, that surely would seem to be an abuse of the court's contempt power, as it would obstruct Mr. Oberlander's ability to continue to tell Congress what he knows of Sater and his involvement with Trump, reportage that this court would have known, had it held hearings and heard evidence, before sealing ECF 28. We now justify this position.

**The Constitutional Invalidity of Sealing ECF 28 as Was Done Here is Pellucidly, if not Astonishingly, Clear.**
***Gag orders are prior restraints so cannot be imposed without a panoply of procedural and substantive constitutional due process.***

In *United States v. Salameh*, 992 F. 2d 445 (2d Cir. 1993), the Second Circuit held that an imposition of a gag order on the extra-judicial speech of counsels (one presumes *a fortissimo* on parties themselves) is the imposition of a prior restraint for constitutional purposes, requiring adversarial due process and the retinue of substantive protection subject to strict scrutiny standards, *infra*.

So, if and to the extent this court stands by its opining during the hearings that sealing orders should prohibit those bound from disclosing outside of court the content of what is sealed in court, even if they don't prohibit disclosure of the same content without linking it to use in court – in other words, prohibit disclosing the fact

that something was filed in court, even if it is already publicly available extra-judicially – then ***this court believes that sealing orders embed gag orders.***

And gag orders, as they are (per *Salameh*) prior restraints, <u>***are presumptively***</u> <u>***unconstitutional***</u>, especially those subject to strict scrutiny, which include all those affecting core, protected speech and include all those which are petitions, insofar as the petition clause protection is *at least* coterminous with the expression clauses, (The petition clause is, as Judge Scalia noted, in fact more fundamental than the expression clauses, since it isn't stratified by purpose. That is, there is only one level of protection, *viz*. strict scrutiny, for all petitioning, even that which is purely parochial, as most petitioning throughout history, including that underlying *Noerr-Pennington* doctrine, has been purely parochial. See *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) (Scalia, concurring in judgment and partially dissenting)).

May we now kill off unsupportable legal reasoning permeating this case, the canard that court orders are presumed valid, which when the order is a prior restraint is *frivolous*, as countless cases refer to a "heavy presumption of invalidity" they bear.

We repeat that for all purposes other than application of the collateral bar rule, ***there is no such thing as a presumption of validity*** of any order prohibiting extra-judicial speech, even in criminal contempt when that which is prohibited is pure speech there is a transparent invalidity exception to the collateral bar rule. (How a separate doctrine of collateral bar developed in the context of criminal contempt is for another time, though students of history know it stems from judicial disdain for,

*first*, the labor movement [*Howat v. State of Kansas*, 258 U.S. 181 (1922)], then, *second*, the civil rights movement [*Walker v. Birmingham*, 388 U.S. 307 (1967)]. Some of the justices obviously felt that *"those"* people just didn't know their place, so they had to apply the (back of their) "civilizing hand of law" to remind them of it, and that they'd best stay there and not make trouble. One might detect the pattern.…)

To be clear, the issue is not defense to criminal contempt. (Of course, invalidity is a defense to civil contempt.) ***Rather, the issue is the expungement and rectification of the constitutional insult this court has perpetrated.***

Before the hearing on June 16, 2017, where Mr. Oberlander appeared for his client, Mr. Cohen, he filed an FRE 201 request asking the court to note that the Third Circuit denies that sealing orders are in any way gag orders, even on trial participants. He asked that this court take care to issue decretal language along with any order it issues, especially sealing orders, so there would be no doubt who is or is not bound to do or not do such thing as the court might set down in its order, especially in view of the long line of cases in this circuit holding that federal courts are powerless to enjoin extra-judicial dissemination of information obtained outside of court process.

But at the hearing, this court said that if material under seal is or was available from extra-judicial sources the seal does not bar free extra-judicial dissemination, *provided* there is no linkage to the existence of the material in the case where sealed.

Let us ignore for a moment the special case where the sealed material is available extra-judicially because it is public, which should (by definition) make its

sealing unlawful and invalid insofar as it could never be effective at preventing harm, which thus presents its own problems. There is no articulable difference, other than label, between two separate court orders which might say:

- "Counsel, you and your client are barred from telling anyone that this material is being used in this case because I am sealing it."
- "Counsel, you and your client are gagged from telling anyone that this material is being used in this case."

That is, if a sealing order, *ipso fact*, bars disseminating the fact of the use of the material in court, it embeds a gag order. So**,** by the court's own reasoning, sealing orders embed prior restraints, and to such extent, their imposition requires constitutional due process and is presumptively unconstitutional.

*Ergo, the constitutional invalidity of sealing ECF 28, and its exhibits, is clear.* Respectfully, Mr. Oberlander and counsel could not face criminal prosecution for telling anyone that that public Supreme Court motion has been filed in this court as part of a brief in support of unsealing the PSR, or For that matter, for telling anyone what arguments were made in favor of unsealing the PSR. This is core protected speech, and any restriction on such speech is presumptively unconstitutional. And since at least two members of the media downloaded the ECF 28 documents before the court "sealed" them, Mr. Oberlander and his counsel could not plausibly face prosecution for discussing those documents with the members of the media.

Yes or no – Will this court decree, *i.e.*, issue decretal language in an order, that documents that the court "sealed" after they came into the possession of the

media are *verboten*, and that Mr. Oberlander and his counsel cannot discuss the documents with those members of the media who downloaded them?

We don't know because your honor didn't tell us, and didn't tell the public either, what it means by "under seal." And since any lawful gag order would have to have been based on record evidence, and record findings of gravely imminent harm, and that a gag order is the least restrictive means necessary to protect against such harm, we suggest that *no reason was given to support a gag order because there is no evidence in the record that could support one*. **None**. A century of prior restraint and a millennium of due process require that:

- Before the issuance of any gag order, we be given the opportunity to refute the claim that there is some grave risk of harm. Indeed, if given the opportunity to rebut the government's and Sater's proffer, we would show the utter dearth of risk of harm.
- We be told, in public, the metes and bounds of any gag order.
- And we be told why it may be issued.


### *The illegality, invalidity, and transparent invalidity of the "sealing"*

Because we are dealing with the special case of a non-existent order, or perhaps it is more judicious to call it a non-observable order, and the burden of "sealing" is on the proponent (which is either the court *sua sponte* or Mr. Sater or the government, or some combination thereof, but surely not us), Mr. Oberlander need not anticipate any actual language that might be in the order or be put in a subsequent version, for he shall have the right to object then.

As to illegality, that depends on whether there is such an order to begin with, but Mr. Oberlander will for now assume without conceding that there is one. Even if there were, it could never be enforced criminally or civilly.

It could never be enforced by a civil contempt because it was issued in absolute violation of procedural and substantive requirements and so is invalid, rather transparently so, and as such cannot form the basis for a criminal contempt. *See Ashcraft v. Conoco, Inc.*, 218 F. 3d 288 (4th Cir. 2000) (sealing order issued without public hearings, record findings, docketed entry, separate writing, explanations of basis for sealing, etc. is *per se* invalid and not enforceable by civil contempt).[2]

And it could never be enforced by a criminal contempt as its absence of decretal language makes it impermissibly vague in its terms. See *United States v. Cooper*, 353 F.3d 161 (2d Cir. 2003) (voiding attorney's conviction for criminal contempt when order of court on phone conference not contemporaneously reduced to writing or memorialized by reporter's transcription. Also *Ashcraft*, *supra* (court order lacking structural formality can't support criminal contempt for lack of clarity).

***An example of the constitutional dilemma***

---

[2] Prior to issuing a lawful sealing order the court must "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives."  *Ashcraft v. Conoco, Inc*., 218 F. 3d at 302.

Meanwhile, at least two separate reporters (judging by inquiries to us) have both downloaded ECF 28 and independently determined that it is now "sealed" if one clicks. Manifestly, they could never have been bound by any order of this court: A court cannot bind a non-party not identified with a party. Therefore, no order is of possible jurisdiction over them unless they be accused of acting to violate it in concert with a party who is bound by it, but again no such party could be charged.

Nevertheless, how does this work, constitutionally? How does a non-party have the right to disseminate information filed with the court that a party, even the filing party, could not then disseminate (not even considering for now that part of the information is public, which makes the constitutional violation even more profound)? How would that not violate equal protection in the First Amendment context of not permitting speaker-dependent or viewpoint-dependent freedom (as C. Collins notes in her letter, ECF 31)?

Then there is the *Zyprexa* problem. In *Zyprexa Litigation*, 07-CV-05014 (E.D.N.Y. 2007), Judge Weinstein was faced with a leak of discovery documents that had been protected by a Rule 26 protective order. He enjoined a dozen persons who were innocent recipients of those documents, in no way involved in the leak. In his opinion justifying the prior restraint, he said that he had to distinguish *Procter & Gamble*, 78 F.3d 219 (6th Cir. 1996), which had been decided ten years earlier. There, BusinessWeek had obtained litigation documents, including a complaint, that had been sealed. The district court enjoined their dissemination by *BusinessWeek* to

14

protect the sanctity of such orders, but the Sixth Circuit overturned the injunction, holding that the First Amendment did not permit enjoining their publication by BusinessWeek. Judge Weinstein distinguished *Procter & Gamble* thus:

The sealed documents disseminated by Gottstein and his co-conspirators consist entirely of materials that were exchanged by the parties in the discovery phase of this litigation. …This case is distinguishable from *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996), relied upon by respondents. In *Procter & Gamble*, an injunction prohibiting publication of "standard litigation filings" — consisting of a memorandum of law, complaint, and case statement —, rather than documents produced in discovery and not relied upon by the court, was overturned. *Procter & Gamble* at 222…. Finally, the enjoined party in *Procter & Gamble* was a member of the media, BusinessWeek magazine. See *id.* at 225 (describing the overturned injunction as part of "a practice that, under all but the most exceptional circumstances, violates the Constitution: preventing a news organization from publishing information in its possession on a matter of public concern"). The enjoined persons here are private, nonmedia-connected individuals.

Abhorrent as it is to write an opinion that distinguishes between the First Amendment rights of the media and those of private persons, it would be far worse for this court to do so, as it must recognize that Judge Weinstein's wriggle cannot work here because C. Collins is a member of the media (and the documents in question are litigation filings as in *Procter & Gamble*, not discovery documents).

And should the court wish to engage in a thought experiment – The court is encouraged to see that if it goes down the road of finding that members of the media have a greater right to disseminate trial information than the party in whose behalf the information was filed (again, where most of it is public anyway), it will "invert" the First Amendment "willing listener" doctrine, such that the media, with more rights than parties, will have to bring suit to allow the parties to tell them what they would like to. That, is without media, and if the party to the case is gagged by a mere sealing order, there would be no one to tell, if only the media could re-disseminate the information, while possibly of small utility value in securing the full employment for First Amendment lawyers, it is otherwise not a venture that should be considered.

**The judiciary should, and must, accept criticism with humility and grace**

Forget the constitutional insult to us, also an insult to the people whom we otherwise would tell with impunity. But do remember you work for us, the people. Your honor sealed a document made public by *order* of the U.S. Supreme Court, a fact which counsel *expressly* represented as true *under oath* in the ECF 28 filing. It is invalid and illegal to seal something *ordered* public by the Supreme Court which has been in the public domain ever since, and available from the National Archives for anyone to read. *But your honor did just that.*

Appalling as that is, it's worse to seal it without *evidence* of its necessity and efficacy. Yet the record of the proceeding shows *no* evidence, only the rank invective of Mr. Wolf, who told this court that the U.S. Supreme Court didn't *knowingly* allow

us to make PSR information from the PSR public, that his client was not served with the motion before it was filed. *Mr. Wolf lied to the court*, **on the record**, yet because your honor sealed the proof that he lied, which is in ECF 28, the public will see only Mr. Wolf's version of the events, instead of the evidence that he lied to the court.

Respectfully, your honor has made a public record showing but one side, the government's and Sater's, of a debate on unsealing the PSR, keeping secret Yale's arguments and ours. **On the public transcript of the June 19th hearing, Mr. Wolf accuses us of fraud and deceit, yet the refutation is sealed. He did the same thing exactly a year ago, on the 16-mc-706 docket.**

I am uploading 16-mc-706 ECF 191, a motion for reconsideration of Judge Cogan's failure to unseal the same Supreme Court filing on *his* docket in 2015, made necessary by the government's and Sater's misrepresentations there, too, that it was sealed at the Supreme Court when it was not. Regrettably, due to Mr. Wolf's fraud, we have been constrained to make the same argument again before your honor. The only differences between that motion and our filing here are (1) we had time then to get a copy of the motion from the National Archives, as 191-1 shows, but did not here; (2) we here included our dialogues with the Supreme Court; and (3) Sater's racketeering co-conspirator is no longer merely a candidate for president, but *the* president. Judge Cogan granted the motion.[3]

_____

[3] The Supreme Court motion was filed in 2015 as ECF 109-5, under seal as, as Judge Cogan admitted, he was ignoring the public's right to access documents by imposing

The facts speak for themselves. The transcript of the June 19, 2017 hearing shows Mr. Wolf insisting that our report that the Supreme Court was told the truth about the PSR and knowingly let us to quote from it is fraud. ***The only fraud is his***.

The transcript shows Mr. Wolf insisting we tried to pull the same fraud on other courts and they all "saw through" it, as (he said) there was no Supreme Court motion, no Supreme Court active participation in redaction, and all courts to date said "nothing from the PSR" will or can ever be on their dockets. ***This is rank fraud and obstruction, indeed a basis for disbarment. Your honor should see it clearly.***

But for this filing on 16-mc-706, Mr. Wolf might have got away with claiming mental inadequacy, that he "didn't remember" or, as he tried to get away with at sidebar, he "wasn't involved" at the time of the Supreme Court proceedings. That dog won't hunt. He knew. The government knew, they were deeply involved in the 16-mc-706 unsealing proceedings, where Mr. Wolf appeared as counsel for Mr. Sater, so both are charged with knowing that docket and its contents.

---

blanket sealing without regard to whether documents should be sealed, to chill our speech by threatening us with contempt, an admission of disregard whether sealing was supportable. The decision granting the motion to reconsider is:

| 07/22/2016 | ORDER granting in part and denying in part Respondents' 203 motion for reconsideration. Respondents' motion attached the documents it stated were already available to the public and, there having been made no application for that filing to remain sealed, it was made available to the public in the 16mc706 docket in accordance with this Court's 6/20/16 Memorandum Decision and Order…The Clerk of Court is directed to make ECF No. 109-5 available on the public docket… Ordered by Judge Brian M. Cogan on 7/21/2016. (Weisberg, Peggy) (Entered: 07/21/2016) (Entered: 07/22/2016) |

In the June 24th filing, we explained that the motion to make public information from the PSR was decided by the Supreme Court, and that Mr. Sater and the government had acquiesced, in that they did not even oppose the motion. We explained that Mr. Wolf has irreparably tainted these proceedings because he lied to the court, and due process cannot stand his involvement in closed proceedings, where lies would go unchallenged. By *Caperton* standards,[4] no objective observer would feel safe with him in a secret proceeding influencing what this court made public about his client's crimes and the government's facilitation and cover-up. Clearly, any report issuing from such sealed proceedings featuring such a perfidious lawyer may be irreparably tainted, unless a transcript of all such proceedings is released.

But now there is more. For besides the Supreme Court motion, this court sealed the brief itself, ECF 28. This is crucial, for it contains, supported by the exhibits, proof that the Supreme Court *preclusively* held that the public has a right to know what is in that PSR, and that Mr. Wolf defiled and defrauded this court when he denied, on the record, that any such thing had occurred, and insisted instead that we had perpetrated a fraud on him, this court, and the Supreme Court.

What reason can this court have to not only hide from the public absolute proof that the Supreme Court has held that the public has a right to know what is in that PSR that constitutes evidence of prosecutorial and judicial misconduct, but also

---

[4] *Caperton v. AT Massey Coal Co., Inc.*, 556 U.S. 868 (2009).

to *weaponizing* that concealment so that Mr. Oberlander and his attorneys might be subject to criminal prosecution if they were to tell anyone what this court has hidden?

For years it has been the same. *Ex parte* meetings and hearings where Sater and the government lie with impunity. Sealing orders issued without cause, even the pretext of cause, like this one, to terrorize us into silence. Open admission that orders are issued knowing that they are invalid, but meant for the same *in terrorem* purpose, taking advantage of the collateral bar rule. Now this.

Briefly, we review the situation. Mr. Oberlander had a PSR dropped in his lap, with other documents. █████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

Yet this court would dare try to criminalize the global dissemination of that document and with it, and the rest of what it sealed, the reality of what has been done.

The *courts* made Mr. Sater what he is, emboldening his crimes by looking the other way, then trying to gag Mr. Oberlander – warning him not to even tell Congress what was going on – as he'd learned that EDNY prosecutors and judges in exchange for cooperation let him keep what he stole  and commit new crime with impunity

The *courts* ordered Mr. Oberlander and all who knew the truth, including Mr. Kriss and others, to stand mute while Mr. Sater engaged in transnational racketeering, even holding hearings before Judge Glasser in mid-2010 to ensure silence, while Mr. Sater was Mr. Trump's "Senior Advisor," whose Trump business card had a phone number in the office of the Trump Organization's general counsel, and while his Bayrock partner Tevfik Arif was trafficking child prostitutes from Moscow into Turkey to service his Russian oligarch investors.

**A "constitutional conscience" is needed indeed.**

We could say we're speechless, but that would be a lie. For as a former editor of *The New York Times*, wrote in a 1994 Op-Ed entitled "Three Months a Murder":

> Do justice but love mercy, said Thomas Paine. If he were around this week he might add this: for Heaven's sake, don't make a mockery of either, or a fool of yourself…

> In New York, Federal Judge I. Leo Glasser looked down at the prisoner before the bench, Salvatore Gravano -- guilty by his own count of taking part in 19 murders of his Mafia colleagues. Mr. Gravano had testified that sometimes he was the shooter, sometimes the backup man and sometimes "I set the guy up."

> So the judge threw the book at the killer -- five years in prison for the 19, all not each. Mr. Gravano has served 4 years of a 20-year sentence he got under an earlier plea-bargaining deal. He will likely be out in eight months. It comes to about three months a murder.

No fine was levied against his millions earned as a Mafia construction racket chief during his killing years. But he did have to pay into a court legal fund. Fifty dollars.

Given the wholesale quality of…Gravano's killings he won…the deal of the century.

[T]he judge [was] convinced [he] had sound reason for taking steps that will astonish any Americans still simple-minded enough to believe that the punishment should in some faint way fit the crime. And [he is a man] of repute in [his field]. That makes [it] even more depressing.

Prosecutors and even a couple of senators had asked him to go easy on Mr. Gravano because after his long career as a Mafia killer he had turned to an allied specialty -- informing on other Mafia killers. He helped put a lot of them in prison, including John Gotti, Thomas Gambino and about 35 others. They told the judge how important it was to have excellent informers and how a light sentence would encourage other gangsters to follow suit.

Since Mr. Gravano could have been put away for life 19 times over, the original 20-year deal seems quite light enough, with maybe his own cell TV thrown in. If Mr. Gravano had said what defendants often do at sentencing time -- judge, I just can't handle that -- the right response from the bench would have been that fine old piece of judicial advice: "Son, just do the best you can."

Yes, most of Mr. Gravano's victims were, like him, enemies of society. But to let their fellow killer off with a kiss of a sentence for knocking off 19 of them is to surrender to the Mafia vision of life, not fight it.

Three months a murder, and out with the flowers of May -- that turns what could have been a judicious sentence into a mockery of justice and mercy. Also, it happens to make me sick.

If Gravano got the deal of the century, Sater got the deal of the millennium, which is something as it's only 17 years old. He's still getting it. We wonder what makes a judicial stomach immune to reactions like Mr. Rosenthal's. But note we deny that officers of the court must circle the wagons to protect the courts and the prosecutors. No, what's happened makes us sick, too, and we assert our right First

22

Amendment right to say so. Lawyers have no lesser right to speak freely of judicial and prosecutorial misconduct than Mr. Rosenthal:

*****

No class of the community ought to be allowed freer scope in expression or publication of opinions as to the capacity, impartiality or integrity of judges than members of the bar. They have the best opportunities of observing and forming a correct judgment. They are in constant attendance on the courts…*To* say *that an attorney can only act or speak on this subject under liability to be called to account and to be deprived of his profession and livelihood by the very judge or judges whom he may consider it his duty to attack and expose, is a position too monstrous to be entertained for a moment under our present system*.

*Ex Parte Steinman and Hensel*, 95 Pa. 220 (1880) (emphasis added).

We wonder if the court agrees. Perhaps another analogy will give perspective.

For years the government resisted revealing the "torture" memos. When they were released, David Cole at the Georgetown University Law Center noted that:

Justice Department lawyers were inextricably involved in justifying every aspect of the CIA program. They wrote memo after memo over a five-year period…all maintaining that any interrogation methods the CIA was planning to use were legal…. [I]t is striking that on every question, no matter how much the law had to be stretched, the Bush administration lawyers reached the same result – the CIA could do whatever it had proposed to do. And long after federal officials acknowledged that the threat of terror had substantially subsided, the OLC continued to distort the law to facilitate brutality.[5]

The Office of Professional Responsibility (OPR) found two attorneys, John Yoo and Jay Bybee, guilty of professional misconduct for ignoring precedent and failing to give objective advice (that is, writing indefensible, results-oriented

---

[5] "Torture Memos: The Case Against the Lawyers," David Cole, *New York Review of Books*, 2009.

memoranda from indefensible propositions), recommending disciplinary referrals, but supporters claimed they acted in good faith and the final report withdrew the recommendations for referrals, finding them "imprecise." What's ironic aspect of this is that the Office of Legal Counsel, which prepared the memos, prides itself as being the highly apolitical "constitutional conscience" of the executive.

There is no such position with respect to the judiciary. Judging by the final portion of *Marbury v. Madison*, Judge John Marshall felt that the Constitution necessarily entrusted the judiciary with being its own constitutional conscience because it entrusted it to engage in the judicial review of government action, though members of all three branches swear an oath to uphold the same Constitution.

That doesn't mean the judiciary can't sometimes use some help. And at times it will have to come from us, the members of the bar, for if not us, then who?

Four freedoms are threatened by this court's acts, freedoms that belong to the people, not the court, freedoms which demand this court reverse itself and repair its constitutional insult:

- The freedom to tell all who will hear it that there is probable cause to believe that both executive and judicial misconduct allowed Sater to perpetrate years of racketeering, hundreds of millions of dollars' worth, much of it with Donald Trump, despite being subject to a cooperation agreement which supposedly prohibited him from committing crime.
- The freedom to show all who will see it that though the Supreme Court has said the public has a right to information from that PSR that evidences prosecutorial and judicial misconduct, this court would hide that fact along with hiding that information.

24

- The freedom to teach all who will learn it that though the court allowed Mr. Wolf, counsel for Sater, to defraud and defile it by lying about the Supreme Court proceedings and calling counsel corrupt, it will not let counsel publicly refute it, though the matters involved are core.

- The freedom to let anyone who will examine it conclude that the court has parented an emanation of apparent structural taint at *Caperton*'s unconstitutionally high possibility levels.

Absolutely no disrespect is intended. We have expressed our right, indeed our duty to criticize, the court, and we ask that the court to realize: **The judiciary has the inherent power to control its own dockets, but we, the people, have the inherent power to control our judiciary.**

## Conclusion

For the foregoing, it is respectfully submitted that ECF 27 and ECF 28 should be made public, because they are not under lawful seal and the declaratory relief as prayed for above granted, with all such other relief as the court deems just and proper. All facts stated above are stated under penalty of perjury, pursuant to 28 U.S.C. 1746.

Dated: July 10, 2017
       New York, New York

Respectfully submitted,

/s/ Richard E. Lerner, Esq.
Attorney for "Richard Roe"
**The Law Office of Richard E. Lerner**
122 West27th Street, 10th Floor
New York, New York 10001
Tel. 917.584.4864
Fax. 347.824.2006
richardlerner@msn.com

25

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE CIVIL CONTEMPT** | |

**12-MC-557**

**MOVANTS' MOTION FOR RECONSIDERATION**

## INTRODUCTION

Frederick M. Oberlander[1] and Richard E. Lerner move "to alter or amend judgment or, alternatively, for relief from judgment or order." Fed. R. Civ. P. 59(e)[2], 60(b).[3]

The order entered June 21, 2016, ECF 199, finally disposing of our motions and those of others to unseal documents filed in this proceeding was erroneous because (1) it repudiates First and Sixth Amendment precedent and violates our civil rights by keeping under seal judicial documents the court acknowledges contain information already publicly available; (2) it keeps documents under seal based on "findings" made without record (or any) evidence and without allowing us to introduce our own contra evidence; (3) to the extent it threatens to bind us to those "findings" in respect of other issues it violates Fifth Amendment due process; (4) by doing these things it disregards the law of the case as set by the United States Supreme Court; and (5) it keeps documents sealed based upon the misrepresentations of the government and Sater that they contain details of cooperation when they do not, and misrepresentations that they are sealed elsewhere – *e.g.* at the Supreme Court – when they never were.

---

[1] Jeffrey C. Hoffman of Blank Rome, counsel for respondent Frederick M. Oberlander, joins in this motion.

[2] A motion for reconsideration under FRCP 59(e) must rely on one of three grounds: (1) intervening change in law; (2) availability of new evidence, not previously available; or (3) need to correct clear error of law or prevent manifest injustice. *North River Ins. v. Cigna Reinsurance*., 52 F.3d 1194, 1218 (3d Cir. 1995).

[3] A party may be relieved from judgment under FRCP 60(b) for "mistake, inadvertence, surprise, or excusable neglect" or "any other reason justifying relief from the operation of the judgment."

# I. THE SUPREME COURT HAS MADE THE LAW OF THE CASE THAT NO INTEREST OF THE GOVERNMENT OR SATER OVERRIDES THE PUBLIC'S RIGHT TO KNOW, AND OUR RIGHT TO TELL, PSR CONTENT

**From the aspect of the public's access rights the order is constitutional error.**

As we explained in prior papers – so only cursorily review as the court may have overlooked it – while on June 21, 2010 Judge Glasser enjoined dissemination of the PSR[4] and on June 29, 2011 the Second Circuit upheld it, the Supreme Court overrode those orders by its own orders *directing* public dissemination of much of the PSR content we cared about *ab initio*.

On May 10, 2012, counsel filed with the Supreme Court an unredacted petition for writ of certiorari in respect of that injunction marked "Filed Under Seal." By order of that Court it was accompanied by a motion of June 1, 2012, but deemed of even date, to let it be filed under seal with a redacted public version. The motion argued that despite the injunction, the facts of this case so strongly suggested government and judicial misconduct in deprivation of victims' rights and facilitation and cover-up of Sater's crimes at

---

[4] His order was issued without regard to PSR content. *There is no finding in the record of those hearings of risk by its dissemination and we ask the court reissue its Order as it states with no foundation that dissemination of the PSR would have threatened Sater's life, pg. 1-2.* The transcript of that hearing, ECF 49, pp. 87 et seq. on 98-CR-1101, shows that the only basis for his injunction was a content-neutral holding that a PSR is exempt from the First Amendment under *U.S. v. Charmer Industries*, 711 F.2d 1164 (2d Cir. 1983). This hasn't stopped Sater from telling the story. In response to our petition the Supreme Court called for responses of the government and Sater. Our reply to their papers, by former Solicitor General Paul Clement, Mr. Lerner's co-counsel. It is also public. Exh D is a copy. Mr. Clement wrote:

> Finally, Doe asserts that it was necessary to enjoin disclosure of the PSR to protect his safety. That contention is flawed on several levels. The 49-page PSR contains exactly three references to Doe's "cooperation agreement," and provides no details about the nature or extent of Doe's cooperation. And this fact had already been disclosed to the public through an unsealed letter from the Department of Justice that refers to Doe's "cooperation agreement." ([see also] newspaper article stating that Doe cooperated with authorities). The government has also conceded that it "has no information that any person has sought to harm the defendant or his family." (Reply Brief, Paul Clement, p.11) (internal page references omitted).

Bayrock that *the public had a right to know what in the PSR might confirm it **and we had a right to tell them**.*

On June 25, 2012, the Supreme Court granted that motion, ordering the submission of proposed redacted versions of the petition and of the motion itself, which was done.

On July 9, 2012, the Court, finding the redactions appropriate, *ordered* the motion and petition filed under seal ***with the redacted versions made public***, which was done.

Like the document Sater filed in Israel, that motion and petition will ever be public. Exh. A is a copy of the motion as we recently ordered it from the National Archives (it took a month to get it).[5] Exh. B is a copy of that petition as it has been on Westlaw since 2012.[6]

---

[5] The court will note that it bears a cover sheet and the imprint of the National Archives.

[6] Anyone with access to Westlaw or the Internet will be able to read the following in the petition:

Doe was up for sentencing in 2004. Though his cooperation agreement _____ of mandatory restitution, his 2004 PSR noted DOJ hadn't produced the victim list required by the MVRA so Probation could contact victims about restitution…As most of the 19 co-defendants and Klotsman had restitution orders, it cannot be that DOJ and Probation couldn't identify Doe's victims; they were the same, as were the losses.

The PSR also shows the Probation Officer, charged to warn employers and others of recidivism risk, knew Doe had been since 2002 as a partner at that real estate firm, yet agreed not to communicate with it, allowing Doe's prosecution to stay hidden from the firm and his partners.

The Officer also stated in the PSR that Doe self-reported no salary from __ but the Officer wouldn't verify it as that might alert the firm to Doe's secret case. At that same time, as alleged in petitioner's RICO complaint, Doe was skimming $___ per year from the firm, calling the money loans. Jane Doe has a recording in which the top officers in the firm admit those loans, some $4,000,000 by 2007, weren't to be repaid, but were to evade taxes.

The Probation Officer concluded Doe had a negative net worth of $___ yet with no income still managed to live in an $_/month house. Mere days after the PSR was issued Doe closed on a $__home with $__cash wired from his firm to the closing attorney; as petitioner's RICO complaint alleges, Doe took a $___mortgage. Presumably, he told the bank something different from what he told his Officer; it's not likely a bank would lend $__ to someone with a negative net worth, no income, and RICO conviction facing a __-year sentence.

The Officer noted that he did not ask what happened to the millions of dollars of crime proceeds Doe had admitted receiving.

Doe was not sentenced until October 23, 2009, so as of its 2004 effective date the Crime Victim Rights Act ("CVRA") applied. Apparently none of the rights was provided. For example, DOJ and

As we have previously argued, there is a First Amendment right of access to documents filed in civil contempt proceedings. That right is violated when information that is publicly available is put or maintained under seal, for by definition such is futile as it cannot facilitate the achievement of any objective for which court secrecy is necessary.

The cert petition was not filed here, but the motion was, and as the June 21, 2016 order places it under seal on the basis that it was sealed at the Supreme Court, reconsideration is required both for unavailability and to prevent injustice, as despite due diligence we were only able to get it sent from the National Archives last week. It takes that long from the time of the request, which we made over a month ago, to fulfillment, and we believed that actual production of that document through public means was necessary to establish indisputably that it, as well as the cert petition itself, which, again, has been on Westlaw and elsewhere online for years, is public.[7]

---

the court were required to notify Doe's victims of the sentencing, if open, and give them the opportunity to be heard. And by law, sentences must be read aloud in open court. The government says Doe was sentenced in public…and argues that the transcript of his sentencing should remain sealed, also admitting that Doe's sentence failed to include restitution; thus, Doe's victims were deprived their rights under the CVRA and the sentence illegal.

In all, as alleged in petitioner's RICO complaint, Doe took about $___ from the firm from ____ through ____ but his victims have received nothing.

Of course, without need of the PSR anyone who knows the case can fill in redactions. All one need do is match case numbers, as the petition refers to the Second Circuit case by docket, which refers to Judge Glasser's case, now in Sater's name, and Judge Buchwald's, so leads to the identity of the parties). The world knows that Doe is Sater, that petitioner was counsel, that the firm is Bayrock, and all reading the now-unsealed complaint in the RICO case can see that Sater is alleged to have skimmed near $1,000,000 per year, that the home he bought was worth $1,750,000 (also a matter of land sales records, with the $1,600,000 mortgage).

[7] This would not have been necessary had the court accepted our sworn statements of the public provenance of that document. There is no reason for the government's and Sater's unsworn statements to the contrary to have been accorded greater weight than ours, as it is impermissible to judge credibility by submission. It doesn't help that they were knowingly false. The court should be aware that at the hearing on June 10, 2016, we provided AUSA Norris a copy of the email from the National Archives and the invoice to obtain a copy of the motion from the National Archives. Notwithstanding that Mr. Norris had led the court in his correspondence to believe that the motion was under seal at the U.S. Supreme Court, he declined to tell the court that the motion was publicly available, for a mere $20 from National Archives.

As it is indisputable that those documents and the information in them, including the major portions of the PSR, are in the public domain there is no basis on which to keep sealed (1) the redacted motion to the Supreme Court; (2) the redacted cert petition to the Supreme Court; and (3) ***the information they reveal***, to the extent present in other documents. See *infra*.

In light of *Gambale*[8] and longstanding First Amendment doctrine, we disagree with the court's finding that the fact that information in a document is publicly available no longer means that its unsealing is required, because, as the court maintains, the public can just go somewhere else to find it. Consider the following:

- As the record reflects, keeping *public* documents sealed can unlawfully infringe the public's right of access. Respectfully, it is contrary to First Amendment law that the judiciary could put certain case documents on PACER so that anyone can read them anywhere, yet other *public* documents are kept sealed, effectively telling the public, such as with the case of the motion made public by the Supreme Court, "go spend $20, order it from the National Archives, and wait a month."

- This assumes the public would know what the document that is *sealed-despite-being-public* actually is and where else to go to find it. Without adequate descriptive labels of its content and other provenance such sealing is a *de facto* unlawful sealing.

- Which creates in the public mind, "How do we know that what you're keeping from access is public as you say." The public's right of access to courts is for it to police its judiciary. The courts should not say, in effect, "Trust us, what's in *there* is public elsewhere," sending the public on a truffle hunt to find out.

- But the main objection to this repudiation of the public's civil rights is that it is based, judging by the court's citation to *U.S. v. Armstrong*, 2016 WL 2643041, at *3 (EDNY 2016), on a "compelling interest" of showing "institutional support" for cooperating criminals; a show of solidarity that will perhaps help recruit cooperators in the future. Strict scrutiny does not permit infringement of core First Amendment freedoms on speculation, without an evidentiary basis on which to conclude that such would be effective. And respectfully, the court lacked authority to decide such an interest is constitutionally cognizable.

---

[8] See for example *Gambale v. Deutsche Bank*, 377 F.3d 133 (2d Cir. 2004), holding that courts may not constitutionally keep sealed that which is already public, indeed may lack any authority to purport to do so.

**From the aspect of respondents' rights to speak and be heard this is a constitutional tort.**

Respectfully, we ask the court to examine this entry from *U.S. v. Curanovic et al.*, 08-cr-00240 (Cogan, J.) (emphasis added). It would appear that this court recognized in that case that there is no lawful basis to seal a publicly accessible document. Yet, respectfully, in the case at bar, this court kept publicly accessible news articles under seal for years until the AP intervened. Moreover, this court seems to have changed course, and decided that if a cooperator is involved, information that *is* public can be sealed. Would the court now instead seal the Gioeli news article on the ground that it's public and that sealing it will show institutional support for cooperators like Mr. Saracino in that case?

| 11/23/2011 | ORDER re 1300 Letter. Counsel for Thomas Gioeli has filed a redacted version of Mr. Gioeli's 1292 opposition and the government has requested that he likewise file a redacted version of Mr. Gioeli's 1265 reply. Accordingly, the only documents that are still subject to sealing are the exhibits annexed to both documents. With one exception…I find that disseminating these statements to the public will endanger the safety of the witnesses. **One of the exhibits, however, is a publicly accessible news article. See Ex. N annexed to Mr. Gioeli's 1292 opposition. There are no grounds for sealing that Exhibit.** It is hereby Ordered that counsel for Mr. Gioeli file a redacted version of Mr. Gioeli's 1265 reply such that the letter itself be made public but the exhibit remain sealed. **In addition, counsel for Mr. Gioeli is Ordered to file an unredacted version of Exhibit N to his 1292 opposition.** These documents must be filed no later than 11/28. Ordered by Judge Brian M. Cogan on 11/23/2011. (Petrocelli, Patrick) (Entered: 11/23/2011) |
|---|---|

Respectfully, how does the court decide which public documents should stay sealed so that cooperating criminals will remain cooperative? This is of concern to us, beyond any concern of the public, as while the public has a First Amendment right of *access* to filing, *as defendants/respondents we have First Amendment rights to **tell** them and Sixth Amendment rights to ensure that they be allowed to **hear***.

We argued in prior papers, so only summarize here, that the Second Circuit has held[9] that even following *Gentile,*[10] attorneys for trial participants may be "gagged" only on an extraordinary showing of need, for example to protect a defendant's right to a fair trial, recognizing that such "gags" are pure prior restraints and noting that actual defendants themselves merit even higher scrutiny before their speech about their case may be gagged.

Of course, we are parties here, not attorneys, so strict scrutiny must apply to any attempt to gag us from reporting about our own trial, including reporting about documents filed in it, and no such prior restraint on our speech may be had without plenary adversarial due process and record findings *on clear and convincing **evidence**.*[11] ***That public information may be kept sealed in solidarity with criminals and we may then be prosecuted for disseminating it in the context of our own trial is a constitutional abhorrence of epochal dimension.***

That's the First Amendment. There is also a Sixth Amendment right to public trial, which in this circuit applies to civil contempt trials as well as criminal and which your honor years ago assured on a now-public transcript would be respected.

**MR. ROE**: All right. On the issue of civil contempt we are requesting that the docket be made separate simply because first, in *In Re: Rosado,*[12] I believe cite mid-86, give or take a year, the Second Circuit ruled that even in

---

[9]  *United States v. Salameh*, 992 F. 2d 445 (2d Cir. 1993).

[10] *Gentile v. State Bar of Florida*, 501 U.S. 1030 (1991) (in the context of a criminal jury trial, state ethics rules restricting a defendant's attorney's extra-judicial speech to the bare extent necessary to preserve the right to a fair trial may be constitutional to a degree beyond what the First Amendment would ordinarily proscribe).

[11] *Carroll v. Princess Anne*, 393 U.S. 175 (1968).

[12] See *In re Rosahn*, 61 F.2d 690 (2d Cir. 1982) (any civil contempt proceeding in which a contemnor may suffer coercive confinement conveys Sixth Amendment rights to a public trial, reserving decision about applicability to other civil contempts). Local Rule 83.6 provides for coercive confinement for civil contemnors who do not pay an award and FRCP § 83 denies this court the jurisdiction to purport to suspend that.

civil contempt proceedings Sixth Amendment rights attach, and a Sixth Amendment right would be meaningless if the public can't find anything that's going on.

**THE COURT**: Okay, well, that's wrong. That's just wrong. The Sixth Amendment right has to do with your right to representation; more specifically, setting a schedule here so you can get representation. There may be other rights that are at issue, but the Sixth Amendment right is going to be fully protected.

Respectfully, we submit that it wasn't wrong then and it isn't wrong now, and respondents' First Amendment and Sixth Amendment rights must be respected.

## II.      IN LIGHT OF THIS NEWLY-FOUND "COOPERATOR EXCEPTION" TO THE CONSTITUTION WE OBJECT AGAIN TO THE FAILURE TO HEAR EVIDENCE

We have made objection to the court's refusal (1) to hear evidence refuting findings as to safety or other need for sealing; (2) to require evidence from Sater and the government to support sealing; and now on reconsideration we object to the court's failure to require to justify by evidentiary constitutional fact-finding the supposed finding that keeping public information sealed furthers a compelling interest of solidarity with cooperating criminals.

## III.     DUE PROCESS PROHIBITS IMPORTATION OF THESE "FINDINGS" INTO OTHER ISSUES

We have argued that non-evidentiary findings of risk and other factors for sealing may not be used preclusively against us as we've had no full and fair chance to litigate them.

## IV.     IN ITS FIXATION ON ORDERS OF JUDGE GLASSER AND THE SECOND CIRCUIT, THE COURT IGNORED THE LAW OF THE CASE SET IN THE SUPREME COURT

In our motion to the Supreme Court to be allowed to publicly file and disseminate a redacted petition for certiorari, we made, *inter alia*, the following arguments:

- ***It is wrong to seal based on nonexistent district court sealing orders.*** Doe's case has been secret 14 years. Past victims lost $40,000,000 to stock fraud and current victims lost $500,000,000 to concealment of his conviction. Without access to the petition, victims can't know their rights were violated, can't intervene, can't submit amici briefs, and can't learn that there are secret criminal trials in U.S. courts and that the U.S. Supreme Court has been asked to stop them.

- ***The PSR is evidence of prosecutorial and judicial misconduct.***

████████████████████████████████

- ***No interest outweighs the public's. There is no evidence of risk to Doe, nor could there be as his conviction and cooperation were known for years.*** The district court *said* there was risk, and the Second Circuit found no error, but the Supreme Court can't validate that repudiation of *Richmond* cases by barring access to the petition.

We won that motion (which was unopposed), even though Sater and the government had been served with notice of it. (Exh. C is proof of service on the government and Sater of the motion on June 1, 2012.) ***They let it go unopposed, forfeiting their right to challenge it. They are stuck with the fact that the Supreme Court has allowed us to make public the information obtained from the PSR that showed governmental and judicial misconduct, and that any alleged risk to "Doe" could not overcome the right to speak of governmental and judicial misconduct. <u>That's</u> the real preclusive matter here. This court has no right to revisit that issue which is law of the case, having been made so by the highest court in the country.***

## V.   MOST OF THIS IS DUE TO MISREPRESENTATIONS OR OMISSIONS OF SATER AND THE EDNY USAO

In their efforts to keep the Supreme Court motion sealed here to avoid having to reconcile that Court's order that PSR information be made public, neither Sater nor the

government told this court that it was public at the High Court. Yet both knew by service and knew recently, by virtue of (1) Mr. Lerner's proffer to the EDNY AUSA Norris on June 10, 2016 the Archive's confirmation that it was available there, and (2) Sater's March 2015, ECF 97, contempt charge for filing it there in the first place.[13] AUSA. Norris filed papers telling your honor that the motion isn't available on the Supreme Court's website, tricking the court into thinking it's sealed there, rather than candidly telling this court that the U.S. Supreme Court does not put motions up on a clickable website. The same is true of their false insistence that other documents contain details of cooperation, as we have argued. In point of fact, the details of Sater's cooperation are unknown to us, save for, *e.g.*, what Sater himself and his co-conspirator have publicly revealed. As Paul Clement noted in his reply brief to the U.S. Supreme Court, the PSR contains no mention of the details of Sater's cooperation.

## CONCLUSION

Accordingly, we ask the court reconsider its order of June 21, 2016 in light of the above, and grant such other relief as it may deem just and proper.

Dated: New York, New York
July 6, 2016

/s/ Richard E. Lerner

---

[13] Sater's counsel charged in his OTSC for contempt: "[¶]7. On May 10, 2012, in knowing and willful violation of the February 10th Order and Summary Order, Defendants filed a motion with the United States Supreme Court to order the docketing and public availability of their petition for a writ of certiorari, in redacted form."

Reproduced at the National Archives

Dear Patron:

We regret that the enclosed photocopies are the best we were able to obtain using our normal reproduction process. This is caused primarily by the age and faded conditions of some of the documents from which these copies were made.

BEST AVAILABLE COPY.



RG 267  RECORDS OF THE SUPREME COURT OF THE
UNITED STATES

## APPELLATE CASE FILES

# 2012 TERM

0112 - 0126

Box 10          A1          Entry 21-2012

12-112-CFY

Richard Roe, et al., Petitioners
v.
United States, et al.

Petition for writ of certiorari to the United States Court of Appeals
for the Second Circuit


ENTER Richard E. Lerner
FILED May 10, 2012

Reproduced at the National Archives

**REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT**

No. 11 M 122

Supreme Court, U.S.
FILED

MAY 10 2012

OFFICE OF THE CLERK

IN THE

# Supreme Court of the United States

————— ▸▸◂◂ —————

RICHARD ROE, JANE DOE, JOHN DOE II,

*Petitioners,*

*v.*

UNITED STATES OF AMERICA,

*Respondent,*

*v.*

JOHN DOE,

*Respondent.*

---

*United States Court of Appeals for the Second Circuit*
*Docket Nos. 10-2905-cr, 11-479-cr, 11-1408-cr,*
*11-1411-cr, 11-1666-cr, 11-2425-cr*

---

## Motion by Petitioner "Richard Roe"

(1) **To Order the Docketing and Public Availability of the Petition for Writ of Certiorari in Redacted Form as Provided Herewith**

(2) **To Caption the Case With the True-Name of Richard Roe**

---

Richard E. Lerner
WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
*Counsel of Record for Petitioner*
*"Richard Roe"*
150 East 42nd Street
New York, New York 10017
212-915-5419

June 1, 2012
(Redacted on July 9, 2012)

Reproduced at the National Archives

1

**To:** **The Honorable Justices of the Supreme Court of the United States**

I, Richard E. Lerner, an attorney admitted to practice before this Court, state under penalty of perjury, pursuant 28 U.S.C. §1746, that the following statements are true, based on my knowledge and my review of the files maintained in my representation of petitioner Richard Roe.[1]

## I.      Statement of Relief Requested and Introduction

1.      Roe herewith submits a proposed redacted version of his petition for writ of certiorari to the Court of Appeals for the Second Circuit, respectfully requesting it be made publicly available by this Court. Additionally, Roe respectfully requests that the case be captioned in his true name.

2.      In sections II, III, and IV, Roe lists the redactions and explains why certain information has been redacted and other information has not. In section V, Roe requests the caption of the case be changed to his name. In section VI, in the context of the public right of access, Roe demonstrates that the public interest in this case is insurmountable, as there can be no compelling or countervailing interest mitigating against public availability of the redacted petition in light of the following:

3.      It would be extraordinary to seal any petition, especially where, as here, such sealing would be predicated upon nonexistent sealing orders of the district court. Without access to the petition, *amici* could not weigh in, though "[A]n *amicus curiae* brief that brings to the attention of the Court relevant matter not already brought to its attention by the parties may be of considerable help to the Court." Rule 37. And this is no ordinary petition. Doe's criminal case has been secret for 14 years. His past victims lost at least $40,000,000 to his first fraud; his current victims have lost some $500,000,000 to his second fraud – *viz.*, his concealment of his

---

[1] This motion is revised, per the June 25, 2012, order of this Court, requiring redaction from the petition for writ of certiorari and from this motion "any appended item containing a party's true name and any reference to such item...."

Reproduced at the National Archives

2

RICO conviction. Attorney Roe has been enjoined from telling Doe's victims and from vindicating the rights of his clients. He has been ordered to stand mute while Doe continues these frauds. Without public access to this petition, Doe's victims cannot know that their rights were violated, cannot intervene, and cannot submit *amici* briefs. But with access, *amici*, victims, and the public will learn that there are secret criminal trials conducted in United States courts and that this Court has been asked to outlaw them. This Court cannot decide this issue in secrecy. **When courts of record fail to act on the record, this Court of last resort must.**

## II.     By Order, Roe's Petition Was Filed as "Sealed"

4.     On February 14, 2011, the Second Circuit ordered that any appeals Roe filed in this Court be denominated "Sealed." JA 1285. Roe filed his petition, so denominated, on May 10, 2012. The Court accepted it on May 14, 2012 and directed him to file this motion and redacted petition.

## III.    The Information Redacted

5.     In the appendix, these items, actually or allegedly under seal below, were redacted:[2]

| | | |
|---|---|---|
| 5.1. | Second Circuit order of January 28, 2011 | App. 29a |
| 5.2. | Second Circuit order of February 4, 2011 | App. 30a |
| 5.3. | Second Circuit order of February 8, 2011 | App. 33a |
| 5.4. | Second Circuit order of February 9, 2011 | App. 35a |
| 5.5. | Second Circuit order of February 10, 2011 | App. 37a |
| 5.6. | ████████████████████████████ | App. 118a |
| 5.7. | Scheduling order of March 23, 2011, District Court, EDNY | App. 131a |

6.     In the petition itself, information that could only be known or inferred from the preceding redacted documents, or from the PSR, criminal complaint, information, cooperation, and proffer agreements which are the subject res of the underlying case, has been redacted.

---

[2] In accordance with this Court's June 25, 2012 order, we have redacted the reference to item 5.6. However, that item is referenced by date the June 29, 2011 decision of the Second Circuit, which is a matter of public record. Additionally, there are further items in the appendix which are redacted, but not listed here, as listing such items here would appear to contravene the requirement that any items contained in the appendix that identify any party by his true name be redacted.

Reproduced at the National Archives

3

## IV.  The Information not Redacted

7.  ***The orders appealed from are not sealed, and so were not redacted.*** Immediately after issuing their summary orders of February 14, 2011 and June 29, 2011, the Second Circuit posted them on its website, where they have been publicly available for a year.[3] Both were published, reported within days, and have been publicly available on Westlaw, Lexis, Leagle, and vLex for a year.[4] They are on blogs such as the Second Circuit Public Defender's. And the press has them.

8.  Because they are actually public, found even by Google search, and have been for so long, *a fortiori* given this Court's Rule 14(d)[5] requiring their indirect publication by citation in the petition, the orders cannot be considered sealed,[6] so were not redacted from the appendix. Since those orders and the information they contain are public, information in the petition which was derived therefrom was not redacted.

9.  ***Information in documents obtained publicly was not redacted.*** That Doe pled guilty to racketeering charges for defrauding investors of $40,000,000 is a matter of public

---

[3] See http://www.ca2.uscourts.gov/opinions.htm, then click "Search" in "Opinions and Summary Orders" and enter docket number 10-2905.

[4] For example, the February 14, 2011 order is at 2011 WL 494282 and 2011 U.S. App. LEXIS 2903. The June 29, 2011 order is at 2011 WL 2559016, and 2011 U.S. App. LEXIS 13335. The PACER public docket's links to those orders were recently disabled, but the Second Circuit reissued the June 29 order on December 12, 2011, in duplicate, as a mandate, and the link to that order is active, and has been for six months, so the June 29 order is in fact available on PACER.

[5] "A petition for a writ of certiorari shall contain...'**Citations of the official *and unofficial*** reports of the opinions and orders entered in the case by courts...'" [Emph. Add.]

[6] Once a document is released by a court to the public it may be freely disseminated. See *Florida Star v. BJF*, 491 U.S. 524 (1989); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975); *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979). Indeed, Second Circuit precedent, *Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004), prohibits sealing a document once it has been disseminated, especially by publication on Westlaw and Lexis:

> But however confidential it [a settlement amount] may have been beforehand, subsequent to publication it was confidential no longer. *It now resides on the highly accessible databases of Westlaw and Lexis and has apparently been disseminated prominently elsewhere.* We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again. The genie is out of the bottle ... we have not the means to put the genie back. [Footnotes omitted; Emph. Add.]

See also *SmithKline Beecham Corp. v. Pentech Pharms., Inc.*, 261 F.Supp.2d 1002, 1008 (N.D.Ill.2003) (Posner, J., sitting by designation) (refusing to seal portions of an agreement containing confidential information already disclosed in the court's opinion.)

Reproduced at the National Archives

4

record, as the government issued a press release on ████████████ so stating. App. 86-96. The

Second Circuit noted in its June 29 order that the press release is publicly available to Roe to

confirm Doe's conviction. That press release, available in ████████████████████, is in the

appendix, and has not been redacted. *Id.*[7]

10. ***Information in documents not subject to sealing orders and obtained without
court process was not redacted***. The petition refers to a conversation Roe's client recorded

lawfully on which senior officers of Doe's real estate firm admit that Doe skimmed millions

from the firm as part of a money laundering and tax evasion scheme. That recording is not sealed

and was obtained without court process. Thus, though the PSR has information that Doe was

defrauding the government of taxes, such information is not exclusive to the PSR, so it has not

been redacted.

11. ***Information evidencing judicial or prosecutorial misconduct was not redacted.***

Information necessary to understand the petition and the argument that the PSR contains

information of public concern – *viz.* evidence of prosecutorial and judicial misconduct – has not

been redacted. For example, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[7] Per the June 25, 2012 order, the press release will be redacted from the petition.

5110310v.1

Reproduced at the National Archives

5

12.    Neither the government nor Doe can have a cognizable interest requiring

redaction of references to the February 10, 2011 *sua sponte* Second Circuit order enjoining Roe

from telling anyone, expressly including Congress, of what he deems judicial and prosecutorial

misconduct, reference to that order has not been redacted. Because the fact that a *United States*

*court has for the first time in our history issued a hyper-injunction[8] criminalizing a citizen's*

*reporting of official misconduct is of unprecedented constitutional gravity*, this has not been

redacted.

13.    Never in American history, before this order, has a United States court threatened

an American citizen with criminal prosecution for reporting to Congress – the sole constitutional

check and balance over the courts – evidence of judicial misconduct, or anything else. There has

apparently been only one other hyper-injunction in modern times,[9] and it was soundly

condemned by Parliament when it came to light.[10]

## V.    Roe Requests that the Caption be Changed to His True Name.

14.    By the Second Circuit's disclosure in its public June 29, 2011 decision that ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, assigned to ▆▆▆▆▆▆▆▆,

Roe's identity is now a public fact, ▆▆▆▆▆▆▆▆▆▆. ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆ a ▆▆▆ search of ▆▆▆▆▆▆▆▆▆▆▆ finds ▆▆▆▆▆▆▆▆▆



---

[8] Orders that purport to gag one from even telling another that the gag order has been imposed have been the subject of a great deal of debate in the Parliament of the United Kingdom. Such orders are called "super-injunctions." Orders which purport to gag one from even reporting to Parliament that such an order has been issued have been called "hyper-injunctions." See "'Hyper-Injunction' Stops You Talking to MP," The Telegraph, March 21, 2011, http://www.telegraph.co.uk/news/uknews/law-and-order/8394566/Hyper-injunction-stops-you-talking-to-MP.html; "Got Secrets You Want to Keep? Get a Hyper-Injunction," The Guardian, http://www.guardian.co.uk/law/2011/mar/21/secrets-to-keep-hyper-injunction.

[9] That hyper-injunction involved a whistleblower's report that the water tanks of a passenger ship regularly traveling in American waters had been painted with toxic chemicals, which report resulted in the shipping company's obtaining a hyper-injunction prohibiting the whistleblower from telling anyone, **even Parliament**, of the case, the injunction, or the health risk. *See* references in fn. 5.

[10] No surprise, given that the last time an English judge enjoined a citizen, or rather a *subject*, from petitioning the legislature for redress, he and the Attorney General were impeached. Chief Judge North had issued an opinion approving Charles II's "Proclamation against Tumultuous Petitioning," assisting the Attorney General in drafting it. As a result, Parliament Resolved: "That the Evidence this day given to this house against sir Francis North, Chief-Justice of the Common-Please, is sufficient ground for this house to proceed upon an Impeachment against him for high Crimes and Misdemeanors." November 24, 1680. From Parliament's subsequent response to this, its enactment of the English Bill of Rights in 1683, we trace our constitutionally codified First Amendment right to petition.

Reproduced at the National Archives

█████. ████████████ figured it out and reported this case on ██████████████, identifying Roe by name. App. 139.

15. A man's reputation is his most precious possession, yet Roe has been deprived of his name, by the Second Circuit's treatment of him as anonymous. This is repellent to him, as the Second Circuit's decision rebukes "Roe" for "flouting" the district court's "sealing" orders, even though:

16. The district court acknowledged on the record that **no sealing order was ever issued in the John Doe case**. (JA166-167, 697). Apparently, he just told a clerk to seal the case, without conducting a hearing and making the requisite record findings, capable of appellate review, prior to sealing the docket. *See Press-Enterprise Co. v. Superior Court of Cal*, 478 U.S. 1 (1986), and, generally, the *Richmond*[11] line of cases.

17. No sealing order could have bound Roe, who was not a party or privy to *U.S. v. Doe* when any "oral" or "implicit" sealing order might have been issued. *Chase National Bank v. City of Norwalk*, 291 U.S. 431 (1934), citing *Alemite Mfg Co. v. Staff*, 42 F.2d 832. No order operates *contra mundum*. So even if an order had said, "No one who comes into possession of documents filed in this court may speak of them," it would have been void as to Roe, *pro tanto brutum fulmen. A fortiori*, as a prior restraint, it would be unenforceable as to Roe for failure to comply with First Amendment due process requirements of an adversarial hearing. *Carroll v. President & Commissioners of Princess Anne*, 393 U.S. 175 (1968).

18. Roe asks recaptioning, that he may prove the rightness of his cause in his true name.

## VI. Maximum Public Access to the Petition is Compelled to Further The Ends of Justice and the Expressly Mandated Intent of Congress

19. The public enjoys presumptive rights of access to judicial dockets, records, and proceedings. The petition for writ of certiorari is a record as to which there is such a presumptive

---

[11] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).

Reproduced at the National Archives

7

right of access. As such it should fall within the second of these two classes of documents (and in any event must fall within the first): [12]

20.   *A presumptive common-law right* of access to all dockets, records, and proceedings (with exceptions such as grand jury proceedings), which may be overcome only upon a sufficient evidentiary showing of a higher **countervailing** interest.

21.   *A presumptive First Amendment right* of access to that subset of the above which experience and logic show are subject to such a right, which may be overcome only upon a sufficient evidentiary showing of a higher **compelling** interest.

22.   Here, it matters not which category the petition is deemed to fall within, as the public import of the issues in this case is **insurmountable**, even before considering the lack of reviewable record findings below, and the lack of evidence of the existence of a countervailing, let alone compelling, interest that would outweigh the right of access. For example, no evidence was proffered, let alone subject to cross-examination, as to a risk to Doe's safety. (And it is hard to see how there could be any danger when his conviction and cooperation have been publicly known for a decade. See App. 87 at fn.2, and App. 102). The district court **said** there was risk, apparently fact-finding by judicial fiat, not evidence, and the Second Circuit found no error in that bald statement. This Court cannot validate such egregious repudiation of its *Richmond* cases by depriving the public of access.

23.   But this Court is obligated to another constituency besides the public: Concealment of an entire criminal case, especially pursuant to non-existent sealing orders, violates Congressionally mandated crime victims' rights, which did not even exist until after the Reagan-era *Richmond* cases.

---

[12] See *Press-Enterprise v. Superior Court*, 478 U.S. 1 (1986) (experience and logic pre-test to find First Amendment right of access); *Nixon v. Warner*, 435 U.S. 589 (1978) (common-law right of access); and the *Richmond* cases.

Reproduced at the National Archives

8

24.   For example, the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. §3771, effective in 2004, affords victims rights, to notice of, and to attend, public court proceedings involving the crime; to confer with the Government attorney; and importantly, to timely restitution as provided by law, to petition the district court to enforce those rights, and to mandamus the courts of appeals if necessary.

25.   In synergy with the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §3663A, effective in 1996 – which requires the court award full restitution and requires victims be notified in advance of sentencing of proposed restitution and allowed to participate in its determination – these laws comprise a regime of rights rendered worthless in cases hidden from the public and the victims.

26.   Here, the government and district court took advantage of the concealment of Doe's case, secretly awarding an illegal sentence, failing to order restitution, ██████████████ ████████████████████████████████████████████████ The district court's failure to follow mandatory sentencing law was illegal. *Ex Parte United States*, 242 U.S. 27 (1916). *Dolan v. U.S.*, 130 S.Ct. 2533 (2010), confirms that the mandate of the MVRA – *viz.*, that the court **shall** order restitution notwithstanding any other provision of law – means what it says.

27.   Petitioner most respectfully avers that the CVRA applies to this Court, and therefore that this Court has a statutory duty pursuant to 18 U.S.C. §3771 to ensure that Doe's victims are given notice of this proceeding. Hence, by virtue of 18 U.S.C. § 3771, there must be, at the very least, public docketing of the redacted petition. We submit, however, that this Court may find that it has a further statutory duty to ensure that Doe's victims are informed of this petition by the DOJ.[13]

---

[13] Compare 18 U.S.C. § 3771 (a) subsections (2) and (4). Under subsection (2), Doe's victims have a right to notice of *any* public court proceeding. Presumably, the instant petition for a writ of certiorari is a court proceeding. Under subsection (4), in contrast, Doe's victims had the right to be heard at any public proceeding in the "district court"

5110310v.1

Reproduced at the National Archives

9

28.    Nor does this end with notifying victims. In response to the press coverage this case

is receiving, a member of New York's congressional delegation wrote to Roe expressing concern

for what appear to be violations of his and his clients' First Amendment rights, and requesting

that Roe provide, by personal visit as well as documentation, all information on the matter as

would not violate court orders. And given the recent experience of Professor (and former Federal

District Judge) Paul Cassell, there seems little point in seeking "permission" from the Second

Circuit to tell Congress the truth.[14] Professor Cassell was a co-author of the appeal brief and

reply brief submitted in this matter to the Second Circuit – hence, has knowledge of the facts he

wished to tell Congress about this case.[15]

29.    Moreover, the sealing and prior restraint orders on Roe and his clients infringe on

their rights of assembly and petition, not only through their private lawsuit(s), which have been

frozen, but by assembly, by collaboration with organizations and individuals who would be

concerned about the issues in this case, and who may well wish to submit to this Court amicus

briefs in Roe's support. For example:

30.    **Victims' rights organizations.** The word "mandatory" in the *Mandatory* Victims

Restitution Act means just that. Yet Doe was given only probation, and a $25,000 fine. Why?

---

involving release, plea, sentencing or parole. We submit that under subsection (2), this Court may be statutorily
required, pursuant to section (b) (1), to ensure that Doe's victims are notified of this proceeding. It states, "In any
court proceeding involving an offense against a crime victim, the court *shall* ensure that the crime victim is afforded
the rights described in subsection (a)." (Emph. Add.) Subsection (c) makes it the obligation of the DOJ to use its
best efforts to notify Doe's victims. We submit that, in order to "ensure" that Doe's victims are informed of this
proceeding, this Court may be required to direct the DOJ to notify Doe's victims of this proceeding.

[14] On April 26, 2012, Professor Cassell testified before Congress on a proposed Victims Rights Amendment. In
advance of testifying, Professor Cassell submitted prepared remarks about the case at bar to the United States
Attorney for the Eastern District of New York for comment. What he received in reply was a warning that there
were sealing orders, that Professor Cassell should take care not to violate them, and that he should get pre-clearance
of his remarks from Judge Cogan of the Eastern District of New York, to whom the Second Circuit had delegated
authority in its February 14th order. Professor Cassell accordingly asked Judge Cogan if his proposed remarks
would violate any orders. Judge Cogan replied that he did not believe he had the authority to issue an opinion on the
matter. This was detailed by Professor Cassell in a letter to Congress. The letter is most readily available on the
website of the University of Utah, School of Law, where Professor Cassell teaches victim rights law. See
http://today.law.utah.edu/wp-content/uploads/2012/04/cassell-transmit-supplemental-letter1.pdf

[15] See *id.*

Reproduced at the National Archives

10

31. **Investment protection organizations.** Organizations committed to protection of investors should be deeply concerned that federal courts would maintain the docket of a RICO stock fraudfeasor for 14 years, emboldening him, to defraud investors, as he has, by the concealment of his conviction, a *per se* material fact. Roe's RICO complaint shows that Doe committed hundreds of millions of dollars of this concealment fraud, with rippling insolvencies and bankruptcies in the wake, leaving possibly a half billion dollars of loss. Yet in none of the courts where these issues are being litigated is it even known that at the center of it all is a convicted RICO stock fraudfeasor.

32. **Bar associations, civil rights, and free speech advocates.** Had the employee who gave Roe the documents showing Doe's secret criminal case given them instead to *The New York Times*, Roe suspects the lower courts would have immediately recognized no prior restrain could issue. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

33. Apparently relying on the fact that Roe is an attorney, the district court, then the circuit court, said he had an obligation to not use the documents. Bar associations should be interested in arguing that attorneys' First Amendment rights are equal to that of the media and other citizens.[16] And it would be interesting to hear their views on whether Roe, an officer of the court, was obligated to use this information on behalf of his clients, and whether – consistent

---

[16] See *Citizens United v. FEC*, 558 U.S. 50 (2010). Roe acknowledges the special case where the **extra-judicial** speech of an attorney to a party in an ongoing **criminal** jury trial might influence the jury pool. *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991). However, in this case, Roe was not counsel of record for any party to *U.S. v. Doe* action, nor was there any possibility that his or his clients' speech could have interfered with Doe's case, as he had pled guilty and been sentenced long before Roe learned of his secret case and illegal sentence. In any event, prohibiting Roe from suing on account of the fraud in concealing Doe's conviction is prohibiting **judicial speech**.

Reproduced at the National Archives

11

with his duties to his clients – he had an obligation to report the judicial and prosecutorial

conduct to appropriate ethics panels.

34.  Bluntly, the lower courts in this case have held that the First Amendment analysis

this Court has applied to leaked "secret" documents that originated in the executive and

legislative branches should be different from the analysis applied to leaked "secret" documents

that originated in the judicial branch. They have held that, though the Pentagon Papers could not

be gagged – notwithstanding that they concerned military secrets, and were arguably stolen – the

documents at issue here **could** be gagged, without First Amendment due process, regardless of

their content, simply because they originated in the courts and had been sealed, in this case with

orders written in invisible ink.[17]

35.  **Judicial oversight organizations.** Such organizations may be concerned that there

was no one protecting the public's right to know what transpired during Doe's sentencing, that

because of his cooperation, Doe was allowed to be sentenced under a pseudonym, ensuring he

would have a virtually clean criminal record, and was allowed not to pay restitution. Because all

this was done in secret, there was no one in that courtroom looking out for the interests of the

public or Doe's victims, though 18 U.S.C. § 3771(a) (2) required the district judge to do so.

---

[17] The information concerned will cast members of the judiciary in a poor light, but it is core speech, and Roe trusts
this Court will hold that an attorney has the same right to criticize a judge before whom he is not appearing as any
public official. In *Grosjean v. American Press*, 297 U.S. 233 (1936), this Court held that "[f]or more than a century
prior to the adoption of the [First Amendment] – and, indeed, for many years thereafter – history discloses a
persistent effort on the part of the British government to prevent or abridge the free expression of any opinion which
seemed to criticize or exhibit in an unfavorable light, however truly, *the agencies and operations of the
government*." 297 U.S. at 245 (Emph. Add.). "Judge Cooley has laid down the test to be applied – 'The evils to be
prevented were not the censorship of the press merely, but any action of the government by means of which it might
prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an
intelligent exercise of their rights as citizens.' 2 Cooley's Constitutional Limitations, 8th ed., p. 886." 297 U.S. 249-
250.

The gag orders imposed upon Roe prevent the discussion in public of what he believes, and what has been briefly
shown in the petition for a writ of certiorari to be, the maladministration of justice. It is also true that Roe has
presented his arguments to the District Court and Circuit Court with brutal candor; but an attorney's right to speak
freely does not end at the courthouse steps. Nor may an attorney be punished for criticizing a judge, or
"undermining" a judge's authority with such harsh criticism, particularly where such criticism is founded in fact and
in law.

Reproduced at the National Archives

12

36.   **Advocates of government transparency.** "Everything secret degenerates, even the administration of justice ...." Lord Acton. The petition shows that some three decades ago the Second Circuit embarked on this path of secret criminal cases, a path which has degenerated to the point that an attorney, Roe, would be threatened with charges of criminal contempt if he were to tell his Congressman, or anyone else, that a federal judge failed to impose upon a RICO fraudfeasor the sentence mandated by Congress.[18]

37.   **The Media.** Roe has been contacted by members of the media and the public, who have deduced his true identity, based upon the information contained in the Second Circuit's June 29, 2011 decision.[19] However, Roe is unable to speak freely with them, and thus the public remains ignorant of the fact that a convicted RICO fraudfeasor has continued to defraud investors, at least by his concealment. Based upon the information contained in the June 29, 2011 decision, and other publicly available information, *The Miami Herald* and others have moved to unseal John Doe's entire docket. Their motion was given a separate Eastern District docket number, 12-CR-150, the captioned, "In the Matter of the Motion to Unseal Docket No. 98-1101." The Miami Herald then moved before E.D.N.Y. Chief Judge Carol Amon to unseal Doe's case, using Doe's real name, which it had deduced from public information. That motion was scheduled to be heard on April 20, 2012, but has been adjourned *sine die*. Clearly, this is a matter of great public concern. ███████████ also published an article about the case on ████████, entitled ███████████████████████████████ The

---

[18] *Ex Parte United States*, 242 U.S. 27 (1916), held it unlawful, the usurpation of the powers of the executive branch and the legislative branch, for a judge to not impose the sentence mandated by duly enacted legislation.

[19] ████████████████████████████████████████████

Reproduced at the National Archives

13

article identified Richard Roe by his true name and stated that ████████████ had

determined Doe's identity from public documents but was withholding it for the time being.

38.   In short, everyone knows what went on here, and who Doe is, and that this has been

kept in such secrecy for so long is shameful. The secrecy must end, we submit, with the public

docketing of the redacted petition.

## Conclusion

WHEREFORE, it is respectfully requested that the Court publicly docket the redacted

petition, and change the caption of the case to identify "Richard Roe" by his true name.

Dated:      New York, New York
            June 1, 2012

            [Redacted and amended to include
            footnotes 1, 2, and 7 on this 9th day of
            June, 2012]

                              Respectfully submitted,

                              WILSON, ELSER, MOSKOWITZ,
                              EDELMAN & DICKER LLP

                              By: _____
                                    Richard E. Lerner
                              150 East 42nd Street
                              New York, New York 10017
                              (212) 915-5419

Reproduced at the National Archives





2012 WL 3041172 (U.S.)                                                                   Page 1

Supreme Court of the United States.
Richard ROE, Jane Doe, John Doe II, Petitioners,
v.
UNITED STATES OF AMERICA, Respondent,
v.
John Doe, Respondent.
No. 12-112.
May 10, 2012.

On Petition For A Writ of Certiorari to the United
States Court of Appeals for the Second Circuit
(Redacted on July 9, 2012)

Petition for a Writ of Certiorari

**Richard E. Lerner**, Melissa A. Murphy-Petros,
Wilson Elser Moskowitz, Edelman & Dicker LLP,
Attorneys for Petitioner, "Richard Roe", 150 East
42nd Street, New York, New York 10017,
212-915-5419.
QUESTIONS PRESENTED

1. Respondent Doe pled guilty to racketeering for
defrauding investors out of $40,000,000, but as his
case was blanket sealed, entirely hidden, the District
Court didn't sentence him to restitution, though by law
such order was mandatory, and didn't notify his vic-
tims, also mandatory. This Court has held that a court
acts illegally when it fails to follow mandatory sen-
tencing laws. Does a sealing order justify a court's
refusal to sentence or otherwise act according to law?

2. The courts know respondent takes advantage of his
sealed case, concealing his conviction from investors
and partners in spite of a duty to disclose. Victims of
this fraud, including petitioner's clients, have lost up to
$500,000,000. Does a court violate the law when it
emboldens crime by maintaining seals?

3. Doe's case is not unique; the Eleventh Circuit pro-
hibits sealed dockets, but Second Circuit courts, in
conflict, indiscriminately blanket seal entire cases,
operating a covert dual justice system, accountable to
no one, without public notice, hearing, or evidentiary
support. Does this violate the constitution?

4. Petitioner learned this from case documents he

received from a whistleblower. They reveal official
misconduct, yet he was enjoined from telling anyone,
*even Congress*, based on an alleged 12-year-old
blanket sealing order no one has seen, to which he is a
stranger. The Third and Sixth Circuits, in conflict,
hold this unconstitutional. Does a court violate the
First Amendment by extending a sealing order into a
prior restraint *contra mundum*, enjoining without due
process one who lawfully and privately receives a
copy of a sealed document from disseminating it?

**\*ii TABLE OF CONTENTS**

QUESTIONS PRESENTED ... i

TABLE OF AUTHORITIES ... vi

DECISIONS BELOW ... 1

JURISDICTION ... 2

CONSTITUTIONAL, STATUTORY, AND REG-
ULATORY PROVISIONS INVOLVED ... 3

STATEMENT OF THE CASE ... 4

I. The Back Story: "White Collar Crime Does Pay" ...
4

II. Respondent Doe's Secret Criminal Case: What the
PSR and Other Documents Reveal ... 7

III. Petitioner learns Doe is a secretly convicted RICO
felon ... 9

IV. Procedural History ... 11

 A. District Court Proceedings ... 11

 B. Second Circuit Proceedings ... 14

 C. Current Status ... 18

REASONS FOR GRANTING THE WRIT ... 18

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

I. The integrity of the federal court system depends on this Court's confirming that a covert dual justice system of secret criminal trials is illegal and can have no place in American law. ... 18

 A. Secret criminal courts are illegal. In particular, they work a fraud on victims. ... 18

*iii B. This Court should put an end to this by holding unconstitutional *per se,* under its existing jurisprudence, any use of sealing orders that violates the separation of powers and the limits of Article III authority. ... 25

 C. This Court should find an absolute First Amendment right of access to criminal docket sheets, resolving the conflict between the Second and Eleventh Circuits. ... 28

 D. This Court should hold the blanket sealing of criminal cases facially unconstitutional. ... 29

 E. This Court should clarify the requirements of the "strict scrutiny" closure test. ... 30

II. Federal courts may not exempt themselves from the First Amendment on some claim of "judicial privilege." When a stranger to a case lawfully receives copies of sealed documents, whether labeled "PSR" or "XYZ," full prior restraint due process must be provided before he may be enjoined from disseminating them; *New York Times v. United States* applies equally to the dissemination of documents sourced to the judiciary as to the executive or legislative branch. ... 32

 A. If Ellsberg had clerked for a judge ... 32

 B. Petitioner has the same rights as media ... 38

*iv CONCLUSION ... 39

APPENDIX

Constitutional, Statutory and Regulatory Provisions ... 1a

Order of the United States Court of Appeals For the Second Circuit, No. 10-2905, dated January 28, 2011

[REDACTED] ... 29a

Order of the United States Court of Appeals For the Second Circuit, No. 10-2905, dated February 4, 2011 [REDACTED] ... 30a

Order of the United States Court of Appeals For the Second Circuit, No. 11-479, dated February 8, 2011 [REDACTED] ... 33a

Order of the United States Court of Appeals For the Second Circuit, No. 10-2905, dated February 9, 2011 [REDACTED] ... 35a

Order of the United States Court of Appeals For the Second Circuit, No. 10-2905, dated February 10, 2011 [REDACTED] ... 37a

Summary Order of the United States Court of Appeals for the Second Circuit, filed February 14, 2011 ... 43a

Summary Order of the United States Court of Appeals for the Second Circuit, dated June 29, 2011 ... 52a, 73a

*v "Secret Pleas Accepted by U.S. Attorney in City," *New York Times,* dated April 23, 1982 ... 76a

"Audit Criticizes U.S. Prosecutor on Secret Pleas," *New York Times,* dated July 4, 1983 ... 81a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 86a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 97a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 99a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 106a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 109a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 118a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 131a

Scheduling Order of U.S. District Court, Eastern District of New York, dated January 26, 2012 ... 137a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 139a

Transcript of Proceedings, dated February 27, 2012 ... 146a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 157a

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 164a

**\*vi TABLE OF AUTHORITIES**

Cases

18 U.S.C. §1964(d) ... 6

18 U.S.C. 3664(d) ... 7

*Bartnicki v. Vopper,* 532 U.S. 514 (2001) ... 38

*Carroll v. Princess Anne,* 393 U.S. 175 (1968) ... 37

*Citizens United v. Federal Election Comm'n,* 130 S.Ct. 876, 905-06 (2010) ... 38

*Dirks v. SEC,* 463 U.S. 646 (1983) ... 36

*Dolan v. United States,* 103 S.Ct. 2553 (2010) ... 22

*Gannett v. DePasquale,* 443 U.S. 368 (1979) ... 25

*Globe Newspapers v. Superior Court,* 457 U.S. 596, 608 n.20 (1982) ... 29

*Hartford Courant v. Pellegrino,* 380 F.3d 83 (2004) ... 28

*New York Times v. United States,* 403 U.S. 713 (1971) ... 2, 33

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 4

*Press-Enterprise v. Superior Court,* 478 U.S. 1 (1986) ... 25

*Procter & Gamble v. Bankers Trust,* 78 F.3d 219 (6th Cir.1996) ... 38

*Richmond Newspapers v. Virginia,* 448 U.S. 555 (1980) ... 19

*Socialist Party v. Skokie,* 432 U.S. 43 (1977) ... 2

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] ... 4

*U.S. v. Eberhard,* 525 F.3d 175 (2nd Cir. 2008) ... 9

*U.S. v. Smith,* 123 F.3d (1997) ... 38

*U.S. v. Valenti,* 987 F.2d 708 (11th Cir. 1993) ... 28

Statutes

18 U.S.C. §1506 ... 22

18 U.S.C. §1964 ... 6, 21

18 U.S.C. 3663A ... 6, 26

**\*vii** *Ex Parte* United States, 242 U.S. 27 (1916) ... 22

Other Authorities

"Secret Pleas Accepted by U.S. Attorney in City," *New York Times,* April 23, 1982 ... 19

*In Re Oliver,* 333 U.S. 257 (1948) ... 19

*Kudzu in the Courthouse: Judgments Made in the Shade,* Smith, 2009 Fed. Cts. L. Rev. 177 ... 19

New Jersey Provincial Charter Ch. 23, July 29, 1674 ... 20

Regulations

28 C.F.R 50.9 ... 36

28 C.F.R. 45.10 ... 36

## *1 DECISIONS BELOW

Two opinions of the Second Circuit have been published, a February 14, 2011 "Summary Order" 414 Fed.Appx. 327, 2011 WL 494282. App. 43a-51a; and a June 29, 2011 "summary order," 428 Fed.Appx. 60, 2011 WL 2559016. App 52-72.[FN1]

> FN1. "App" references the appendix herein; "JA ___" the joint appendix submitted to the Second Circuit; "SA ___" the special appendix filed with the Second Circuit.

All other orders are, or are allegedly, under seal. Those necessary to consideration of this petition are in the appendix.

## *2 JURISDICTION

This appeal is from a permanent prior restraint injunction upheld in a June 29, 2011 Second Circuit order; other orders therein extending and interpreting previous prior restraint orders *pendente lite,*[FN2] App. 52a-75a; and from the Appellate Court's denial of a petition for mandamus.

> FN2. *Socialist Party v. Skokie,* 432 U.S. 43 (1977); *New York Times v. United States,* 403 U.S. 713 (1971).

Petitioner and *pro se* appellants below timely moved for rehearing and rehearing *en banc*, the last was denied on December 12, 2011. By March 9, 2012 letter this Court granted a 60 day enlargement, to May 10,

2012 to file this petition.

Statutory jurisdiction lies in 28 U.S.C. 1254(1).

## *3 CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED

U.S. Constitution, Article III

U.S. Constitution, Amendment I

U.S. Constitution, Amendment VI

18 U.S.C. § 1506, "Theft or Alteration of Record or Process; False Bail"

18 U.S.C. § 3553(c), "Imposition of a Sentence"

18 U.S.C. § 3663, "Order of Restitution"

18 U.S.C. § 3663A, "Mandatory Restitution to Victims of Certain Crimes"

18 U.S.C. § 3664, "Procedure for Issuance and Enforcement of Order of Restitution"

18 U.S.C. § 3771, "The Crime Victims' Rights Act"

Federal Rule of Criminal Procedure 32, "Sentencing and Judgment"

Federal Rule of Civil Procedure 65(d), "Injunctions and Restraining Order"

28 CFR § 45.10, "Procedures to Promote Compliance with Crime Victims' Rights Obligations"

28 CFR § 50.9, "Policy with Regard to Open Judicial Proceedings"

## *4 STATEMENT OF THE CASE

I. The Back Story: "White Collar Crime Does Pay"

In 1994, Doe, Sal Lauria, and Gene Klotsman acquired a stock brokerage. Backed by organized crime, they acquired large blocks of stock,[FN3] then, "incentivizing" their brokers by beating or threatening to kill

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

any who got out of line, they got customers to buy, the stocks rose, and they sold and pocketed a fortune, the stocks then falling.[FN4] Pump and dump.

> FN3. [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT]

> FN4. [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT]

Doe, with a felony conviction for assault with a deadly weapon, was barred from the securities industry, so his ownership interest and control in the brokerage were concealed. App. 97a-98a.

Competitors, also backed by organized crime, started shorting the stocks. According to Lauria, Doe announced he might murder one, Alain Chalem, but did not. Doe's father, a reputed Mogilevich crime boss who would soon be convicted of extortion with the Genovese family, had dinner with Chalem and was heard arguing. The next day Chalem was found dead, shot in the head several times.[FN5]

> FN5. [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT]

**\*5** Victim losses were $40,000,000 to $80,000,000 when in 1998, Doe forgot to pay rent on a locker. App. 73a. The owner broke in, saw weapons and incriminating documents, and called the FBI. App. 73a.

In 1998, Doe, Lauria and Klotsman secretly pled to racketeering and became cooperators. App. 87a, fn. 2, 102a. Their cases were blanket sealed, apparently without sealing orders issued, or anyone requesting one[FN6].

> FN6. As discussed *infra*, District Court Judge Glasser acknowledged on the record several times that he never issued a "formal" sealing order. JA 152-153, 164, 166-167, 167, 235, 697.[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] SA44.

On March 2, 2000, 19 underlings were arrested. The

[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] issued a [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] with the [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] announcing the arrests and noting by their true names that Doe, Lauria and Klotsman had already pled guilty to racketeering. App. 86a, 87a.

On February 2, 2001, *in open court with co-defendants and counsel present*, Doe's status as a cooperator was openly discussed, his real name used[FN7], App. 102a. The public docket for the case, [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT], shows "3500" letters going to defendants regarding Doe, using his real name and calling him a government witness. So much for any purported secrecy of pleas and cooperation.

> FN7. In spite of this, the government implied in its March 17, 2011 motion to unseal Doe's case that [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] App 118a-129a.

**\*6** In 2002, all 19 pled guilty. Most received a few years' incarceration and restitution of a million dollars or so.

In 2002, Klotsman, who had stopped cooperating, was sentenced[FN8] to 6 years' incarceration, and $40,000,000 of restitution. App. 109a.

> FN8. Doc. 4 Case 02-CR-1313-ILG EDNY.

In 2003, Lauria published his tell-all account, *The Scorpion and the Frog*, describing his and his partners' cooperation. [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT]

Lauria was sentenced in 2004 to racketeering predicated on securities fraud and money laundering[FN9]. Although the guideline was about 17 years, he got probation and a small fine. Fn. 9. Though by his plea he admitted responsibility, as one of the three ring-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

leaders, for *all* losses, and the scheme straddled the effective date of the Mandatory Victim Restitution Act, 18 U.S.C. §3663A ("MVRA"), App. 6a, making restitution mandatory, his order of judgment shows no restitution. Fn 9. The statement of reasons is blank. Fn 9. As he was sentenced in secret there is no knowing why.

> FN9. Doc. 15 Case 98-CR-1102-ILG EDNY.

Though he started the fraud in 1994, the four-year statute of limitations for civil RICO claims against him did not begin to run until he was sentenced. 18 U.S.C. §1964(d). His victims had until 2008 to sue, and had the court imposed the mandated order of restitution, they would have been entitled to summary judgment on liability. 18 U.S.C. §3664(1). Instead, due to the blanket sealing, his victims were not aware of any of this

***7** Conveniently, Lauria's criminal case remained hidden until April 2009[FN10], when it was unsealed at the request of the government, too late for his victims to easily sue, or seize the $1,500,000 "fee" he had got in 2007 from a real estate developer largely owned and controlled by Doe, where Lauria worked from time to time between 2002 and 2007. App. 160a. Lauria would have had to give that to his victims if he had been ordered to make restitution. 18 U.S.C. §3664(k).

> FN10. See generally Case 98-CR-1102-ILG EDNY

On receiving that fee, he autographed a copy of his book for a friend, inscribing, "White Collar Crime Does Pay." JA 737.

## II. Respondent Doe's Secret Criminal Case: What the PSR and Other Documents Reveal

Doe came up for sentencing in 2004. Though his co-operation agreement [REDACTED IN ACCORD-ANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] of mandatory restitution JA 473, his 2004 Presentence Report, or "PSR," noted DOJ hadn't given the victim list JA 514, required by the MVRA so Probation can contact victims about restitution. 18 U.S.C. 3664(d)(2).

As most of the 19 co-defendants and Klotsman had

restitution orders, it cannot be that DOJ and Probation couldn't identify Doe's victims; they were the same, as were the losses.

The PSR also shows the Probation Officer, though charged with warning employers and others of recid-ivism risk, knew Doe had been working since ***8** 2002 as a partner at that real estate development firm, yet agreed not to communicate with the firm, thus al-lowing Doe's prosecution to remain hidden from the firm and his partners[FN11]. JA 515.

> FN11. Doe and Lauria occasionally worked together there. App. 160a. Probation would have to have known, as Lauria was then on probation pursuant to terms which forbid association with felons without permission. fn9.

The Officer also stated in the PSR that Doe self-reported no salary from [REDACTED IN AC-CORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] but he (the Of-ficer) wouldn't verify it JA 537-538, as that might alert the firm to Doe's secret case. JA 537.

At that same time, as alleged in petitioner's RICO complaint, Doe was skimming $[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 OR-DER OF THE U.S. SUPREME COURT] per year from the firm, calling the money loans. JA 342. Jane Doe has a recording in which the top officers in the firm admit those loans, some $4,000,000 by 2007, weren't to be repaid, but were to evade taxes. JA 344.

The Probation Officer concluded Doe had a negative net worth of $[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT], JA 540, yet with no income still managed to live in an $[REDACTED IN AC-CORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT]/month house. JA 534. Mere days after the PSR was issued Doe closed on a $[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] home with $[REDACTED IN ACCORD-ANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] cash wired from his firm to the closing attorney; as petitioner's RICO complaint alleges, Doe took a $[REDACTED IN ACCORD-ANCE WITH THE JUNE 25, 2012 ORDER OF THE

U.S. SUPREME COURT] mortgage. JA 341. Presumably, he told the bank something different from what he told his Officer; it's not likely a bank would lend $[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] to someone with a negative net worth, no income, and RICO conviction facing a [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT]-year sentence.

The Officer expressly noted that he did not ask what happened to the millions of dollars of crime proceeds Doe had admitted receiving. JA 541.

**\*9** Doe was not sentenced for another 5 years, until October 23, 2009, App. 128a, so as of its October 2004 effective date the Crime Victim Rights Act ("CVRA"), App. 14a, applied to his case. *U.S. v. Eberhard,* 525 F.3d 175 (2nd Cir. 2008). Apparently none of the rights was provided. For example, DO J and the court were required to notify Doe's victims of the scheduled sentencing, if open, and give them the opportunity to be heard. App. 14a-15a. And by law, sealing or no sealing sentences must be read aloud in open court, 18 U.S.C. §3553(c).

Yet the government says Doe was sentenced in public, though under the name Doe, and has argued that the transcript of his sentencing should remain sealed. App. 128a. The government has also admitted that Doe's sentence failed to include restitution; thus, Doe's victims were deprived their rights under the CVRA and the sentence illegal.

In all, as alleged in petitioner's RICO complaint, Doe took about $[REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] from the firm from [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] through [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT], but his victims have received nothing. JA 299.

III. Petitioner learns Doe is a secretly convicted RICO felon

As noted, petitioner is a New York attorney who represents Jane Doe and John Doe II, minority part-ners in the real estate developer Doe largely owned and controlled. The firm's projects include an internationally prominent $450,000,000 New York hotel condominium. Jane Doe is its former Director of Finance.

**\*10** Jane Doe and John Doe II engaged petitioner on suspicion they had been defrauded by other partners, including Doe, who was its Chief Operating Officer and Managing Director. Subsequently, petitioner's clients directed him to sue.

When petitioner began drafting a RICO complaint in 2009, publicly available information showed Doe was "connected to" organized crime. For example, a [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] article, App. 73a, and a [REDACTED IN ACCORDANCE WITH THE U.S. SUPREME COURT] article, App. 109a, discussed Doe's involvement in State Street, the aforementioned stock fraud. It was widely believed Doe had been an "unindicted co-conspirator" who avoided prosecution by cooperating. App. 110a.

There was, however, information from which one could infer Doe *had* been prosecuted. For example, Klotsman told the [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] Doe had pled guilty. App. 110. The [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] quoted Doe's lawyer, who didn't deny it, but just challenged anyone to find it. App. 116a.

On March 1, 2010, these suspicions were confirmed when unexpectedly, and without solicitation, petitioner received documents from a whistleblower, a former employee of Doe's firm, who told petitioner he had got them from the firm's files. JA 187-191, 196-198.

The documents were a criminal complaint, JA 590, information, JA 588, proffer, JA 466, and cooperation agreement JA 472-480, all from 1998, and a PSR from 2004 JA 496-544, all from Doe's secret case, 98-CR-1101 E.D.N.Y., identifying Doe by his true name, confirming Doe had pled guilty to racketeering, and had been scheduled for sentencing in 2004.

**\*11** Petitioner, concluding $750,000,000 of the firm's

capital, $550,000,000 bank debt, and $200,000,000 equity from development partners had been procured with the fraudulent concealment of Doe's conviction, and that the firm's customers were being defrauded daily by sales of condominiums pursuant to false and misleading offerings, acted quickly.

On May 10, 2010, petitioner filed a civil RICO complaint, 10-CV-3959, S.D.N.Y., charging Doe and others with operating the firm through a pattern of crime, including excerpts from the documents. Within a day [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] had the story and a copy of the complaint with the excerpts online, available for download. App. 164a. Additionally, upon receipt, the firm's general counsel disseminated the complaint to several named defendants and attorneys on May 12. JA 740.

IV. Procedural History

A. District Court Proceedings

*2010 - The TROs and Permanent Injunction*

**Initial TROs.** On May 18, Doe obtained an *ex parte* TRO from the same judge who had secretly prosecuted him, (Glasser, J., E.D.N.Y.), enjoining dissemination of the documents and ordering a hearing to ascertain how petitioner got them.

**Bench Statements.** On July 14, the first of four days of hearings, petitioner asked the court to reveal any order purporting to seal anything, or bind him. JA 147. Judge Glasser admitted "there is no formal **\*12** order" but "from the very first document that was filed, it was filed clearly indicating a sealed case." He admitted he couldn't "find any order signed by me, which directed that this file be sealed," and that there was no indication in the first filing "or in any subsequent document that an application was made or request was made in that document to seal that file." JA 160-167, 697. *Judge Glasser admitted there were no orders ever issued that bound petitioner and **there were no sealing orders ever issued.** JA 697.

**Hearings.** On June 21, the third day, petitioner testified, explaining how he got the documents and why he had a First Amendment right to use them. He testified that none indicated they had been "sealed" and, in any

event, it has been the law for 70 years that orders cannot run *in rem*, but must be expressly directed against a party or privy. JA 232-234,255-258. Judge Glasser agreed that a sealing order is directed only to court personnel. JA 697.

**The Permanent Injunction.** After petitioner testified, Judge Glasser (without notice, other testimony, or argument) permanently enjoined dissemination of the PSR and its contents, essentially ruling a PSR exempt from First Amendment prior restraint considerations. JA 265.

**Hearings (cont'd).** Doe testified last. Consistent with petitioner's testimony that the whistleblower had said he had got the documents from the firm, Doe admitted keeping copies of the documents at his firm, in his desk and "possibly" on its computers JA 277-282, and, importantly, saying nothing of any specific threat to his or his family's safety.

**\*13 Bench Statements.** On July 20, the fourth day, Judge Glasser stated that the whistleblower had not testified, but one could infer that he "may" have stolen the documents. But "[w]hat order of the Court was violated by that event?" JA 698. He could find no theory by which any court order had been violated, or how anything petitioner did could have violated any court order, though he reserved decision. JA 700.

*2011*

**The Mandamus Petition.** In early February, in response to the Second Circuit's demands for a docket from the District Court, petitioner requested Judge Glasser make one and also requested he comply with the CVRA by recognizing his clients as crime victims and dealing with Doe's past victims.

**The Government Moves to Unseal.** On March 17, acknowledging that [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT], the government moved to unseal much of the case. App. 86a-87a, 118a, 120a. [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] See *infra*.

**The Scheduling Order.** Notwithstanding that Judge Glasser acknowledged that he had never issued a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

"formal" sealing order, and had acknowledged that sealing orders only bind court personnel, Judge Glasser issued a [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT], petitioner had "flouted" an "implicit" sealing order. App. 134a.

*14 B. Second Circuit Proceedings

*2011 - Sealing the Appeal*

**Orders.** In a series of orders, App. 29a-42a, the Second Circuit ordered the government to show cause why the appellate docket should not be unsealed, ordered that oral argument with respect to that motion be conducted in a sealed courtroom, and issued *sua sponte* gag orders barring the petitioner and his clients from revealing any documents or contents thereof filed in related cases in the Eastern or Southern Districts or the Second Circuit. *The court expressly barred the petitioner from reporting to Congress documents showing that the District Court unlawfully failed to impose a congressionally mandated sentence of restitution.* App. 41a.

**The Mandamus.** Meantime, since there was no docket (and there is still none) at the District Court, and Judge Glasser had not taken up petitioner's "demand," petitioner filed a mandamus in the Second Circuit, seeking an order to compel the District Court to publish a docket and begin to comply with the CVRA, for example to direct the District Court to cause the victims of Doe's crimes to be notified of their right to congressionally mandated restitution.

**Argument.** Argument with respect to the government's motion to seal and the mandamus proceeding was held February 14, in a sealed courtroom. JA 39-42.

*The government* said Doe's criminal case had been secret since inception, that while "[t]here have been public accounts [of Doe's prosecution] … they have been lacking in terms of their corroboration and *15 the government seal of approval, if you will. The government feels that is an important difference." JA 1263-1264.

Referring to [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S.

SUPREME COURT] article, App. 109a, the government acknowledged it reported that Doe had been involved in State Street with Lauria and Klotsman, "[b]ut the [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] itself couldn't find any confirmation of that," JA 1266, so "…the government advocates for a sealing that does not release the real name of Mr. Doe and does not reveal facts that would alert other individuals to his cooperation or conviction." JA 1269.

The government, on questioning by the panel, said it believed there was a serious risk of harm to Doe if any of this got public.

*Petitioner* argued that none of these facts were in the record, so were only argument, and that the First Amendment required the appellate docket be public. JA 1283-1284. The court seemed to concede that *media organizations* could not have been enjoined had they come into possession of the documents at issue, and such appellate proceedings would be open, but petitioners could be gagged because they're not the media:

**Judge Cabranes** asked for assurance from the government that: "[W]e are not talking about preventing a news organization from publishing a matter of public concern or impinging on editorial discretion." JA 1270.

**Judge Pooler** responded to petitioner's First Amendment arguments with: "We are not dealing here with prior restraint *16 of the press or media. That's what the *Pentagon Papers* case was about." JA 1281. "[Newspapers have a special charge in publishing information for citizens. [Petitioner] doesn't have any charge in making this information available to citizens." JA 1284.

**The February 14 order.** The court then issued its summary order, A 43, (1) denying the petition for mandamus and (2) maintaining the appellate case under blanket seal.

*The Mandamus.* Although there was no sealing order in Doe's case, and no notice, hearing, or findings to support sealing, the court found no abuse of discretion in keeping a secret district court docket, *without explanation.* The Second Circuit indicated that it might explain its ruling on a later date. App. 47a. It never has. It has never mentioned the CVRA component of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the mandamus petition.

*Sealing the Appeal.* The court ordered the seal on the appellate case maintained, applying a balancing test, "In light of the serious, indeed grave, concerns expressed by the United States regarding the possible consequences of unsealing these documents, and the absence of any sufficiently persuasive countervailing considerations expressed by [petitioner]…" App. 48a.

*Prior Restraints Pendente Lite.* The order continued the February 10th injunction, "re-emphasizing that petitioner was not to reveal or distribute **sealed** documents, nor the contents thereof, to any third-parties, including members of the public or the media." App. 48a [emphasis added].

**\*17** *2011 - The Merits Appeal*

**Petitioner's brief** argued that the District Court gag orders were unconstitutional and otherwise contrary to law because (l) the documents were obtained without court process so were outside the jurisdiction of the court; (2) the documents revealed prosecutorial and judicial misconduct, so the information therein concerned core speech; (3) a sealing order had never been issued; (4) even if it had, it couldn't have bound petitioner, a stranger to the case; (5) even if it could bind petitioner, without decretal language enjoining speech, it could not be interpreted to do so; and (6) even if it were so interpreted, there had been no prior restraint due process, no findings at a clear and convincing level of a compelling interest, near certain imminent grave harm, and no other alternative; and (7) any constitutional limit on attorney speech applied only to extra-judicial speech during an ongoing criminal jury trial, certainly not to revealing official misconduct or suing for injuries to his clients.

**The government** argued (l) the whistleblower stole the documents from Doe (though there was no such evidence); (2) petitioner had an obligation as an attorney not to use them; (3) dissemination of the information contained in the documents would pose a grave risk to Doe and national security (again without any evidence, and contrary to the position taken by the government mere days later in its March 17, 2011 motion to unseal the District Court Docket, App. 118a).

**The decision.** As noted, in its June 29th summary

order, the Second Circuit continued the **\*18** temporary injunctions, upheld the permanent injunction directing the "return" of the PSR and barred dissemination of the information contained therein, remanding for further proceedings with respect to the non-PSR documents.

C. Current Status

The Second Circuit has yet to issue a decision explaining the denial of the writ as to unsealing the docket for Doe's case and has not yet taken up the writ as to ordering the District Court to comply with the CVRA. The District Court has not yet ruled on the remanded issue of the remaining documents. Pending resolution of all these sealing issues petitioner's civil RICO complaint remains under seal in the S.D.N.Y. and the case is frozen.

REASONS FOR GRANTING THE WRIT

I. The integrity of the federal court system depends on this Court's confirming that a covert dual justice system of secret criminal trials is illegal and can have no place in American law.

A. Secret criminal courts are illegal. In particular, they work a fraud on victims.

Counsel have not cited, and we have been unable to find, a single instance of a criminal trial conducted *in camera* in any federal, state, or municipal court during the history of this country. Nor have we found any record of even one such secret criminal **\*19** trial in England since abolition of the Court of Star Chamber in 1641, and whether that court ever convicted people secretly is in dispute. - *In Re Oliver, 333 U.S. 257, 266 (1948)*

They should have looked in New York. In the thirty years since *Richmond Newspapers v. Virginia, 448 U.S. 555 (1980)*, this Court has repeatedly affirmed a First Amendment right of access to criminal proceedings.

In the same thirty years, the courts of the Second Circuit, at least the Eastern and Southern districts, have operated in egregious defiance of it.

In 1982, *The New York Times* described a system of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

secret justice prevalent in the S.D.N.Y., of hidden guilty pleas, and, often, hidden sentencings for cooperators"[FN12]. An ensuing GAO audit ordered by Congress found the problem present nationwide, but some *50 times* as frequent in New York[FN13].

> FN12. "Secret Pleas Accepted by U.S. Attorney in City," *New York Times,* April 23, 1982. App 76a.

> FN13. "Audit Criticizes U.S. Prosecutor on Secret Pleas," *New York Times,* July 4, 1983. App 81a.

Washington may be, now, a close second[FN14].

> FN14. In 2006, a study revealed 469 criminal cases conducted in complete secrecy between 2001 and 2005. And while *In re Sealed Case* first appeared as a case name in 1981, it is now the most common case name on the D.C. Court of Appeals docket. *Kudzu in the Courthouse: Judgments Made in the Shade,* Smith, 2009 Fed. Cts. L. Rev. 177.

Interestingly, the U.S. Attorney at the time denied this was for cooperators' safety, insisting it *20 was for the convenience of the government, so their identity would remain secret. No one asked how he thought that might work out for the victims.

One might say that U.S. Attorney operated before victims' rights were elevated, before the first such statute, the Victim Witness Protection Act, took effect in 1983, but for long before the VWPA, courts could order restitution as a condition of probation, and two things may be safely concluded, (1) few if any who got these secret convictions were incarcerated, as that would make the secret hard to keep; and (2) few if any had restitution imposed as a condition, as that too would expose the secret.

Lord Acton observed, "Everything secret degenerates, even the administration of justice," a value similar to that expressed in colonial charters:
That in all publick courts of justice for tryals of causes, civil or criminal, any person or persons, inhabitants of the said Province may freely come into, and attend the said courts, and hear and be present, at all or any such tryals as shall be there had or passed, that *justice may*

*not be done in a corner nor in any covert manner*[FN15].

> FN15. New Jersey Provincial Charter Ch. 23, July 29, 1674.

Now, as this case illustrates, the problem is at scandal level, and the damage done to victims is incalculable. And we are all victims when the integrity of the federal justice system degenerates. And only this Court can stop it.

What would they say, men like John Lilburne, who, tried for treason during the reign of Charles II, *21 insisted on his right to a public and open trial - "as an understanding Englishman (who in his actions hates deeds of darkness, holes or corners)…. But if I be denied this undoubted privilege, I shall rather die here than proceed any further." - were they to learn that we have a system one of dual justice, where defendants who can *pay* enough will get secret trials, illegal deals, and hidden dockets?

And make no mistake - In the shadow justice system, hidden justice *is* for sale, admission *paid* in the currency of cooperation.

Most of these hidden cases are those of cooperators. Petitioner makes no argument that cooperation and plea bargaining are, or ought to be, unconstitutional or illegal; those are matters of politics, of executive discretion, not relevant here.

But when the government crosses the line into illegality and the courts don't stop it, when sealing orders work injustice to crime victims and embolden the criminal defendant to continue on his path of crime, attention must be paid. Notice must be taken.[FN16]

> FN16. As indicated in a recent [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] article, victims of Doe's concealment fraud would never have invested millions of dollars in the [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT] project if they'd known his background. App. 157a.

For example, in respondent John Doe's case, though

his stock swindles ran from 1994 through 1996, pursuant to 18 U.S.C. § 1964(d) his victims were precluded from suing him in civil RICO until he was sentenced in October 2009, when a four-year statute of limitations first began to run. In other words, they can still sue him *now*.

**\*22** 18 U.S.C. §1506, App. 3a, makes it an obstruction of justice to conceal a federal court judgment in such manner that it does not take proper and full effect. It has been in force since 1790. Yet petitioner is barred from taking steps to reveal this, that would give effect to the secret final judgment of conviction rendered against respondent Doe. And the courts below, respondent Doe, and the government are preventing the judgment from taking effect.

For example, if Doe had been ordered as part of his sentence to pay to victims restitution, as the law required that the district court do, 18 U.S.C. §3663A, App. 6a, they would be able to use the order to obtain summary judgment of civil RICO liability, 18 USC §3664(1). App. 12a-13a.

How does a district court justify refusing to comply with provisions of mandatory sentencing law? It doesn't. It can't.

This Court so held, unanimously, in *Ex Parte United States,* 242 U.S. 27 (1916): When a federal court refuses to impose a mandatory sentence it violates the law and operates *illegally*. If there were any doubt that this applies to a mandatory sentence of restitution, this Court put that to rest in *Dolan v. United States,* 103 S.Ct. 2553 (2010), noting that when Congress wrote in the mandatory restitution statute that such an order must be imposed at sentencing *notwithstanding any other* provision of law, 18 U.S.C. §3663A, Congress meant what it said.

What about cooperator safety? Every filing by respondent Doe and the government solemnly intones that warning, arguing that the courts must **\*23** hide all this to keep Doe safe. To which the reply must be, where in Article III are the federal courts vested with police powers?

*Ex Parte United States* answers, "Nowhere." *Humanitarian considerations (the health and safety of the defendant) cannot justify a court's defiance of the law,* concluding with the statement: **"*Rule made abso-**

lute,"** 242 U.S. at 53 [Emphasis added], making it clear: there is *never* any lawful basis for a court to refuse to obey mandatory sentencing law. All courts in the country were thereupon required to comply with mandatory sentencing laws. Some 2000 defendants throughout the country faced sentencing that they thought had been delayed indefinitely after this Court ruled in *Ex Parte United States.*

And what about the current victims, not of the underlying crime, but of its concealment? As the courts below well know from all the submissions, respondent has been a principal at a New York real estate developer, its former Chief Operating Officer and managing director from about 2002 through 2008. JA 298. Even without the submissions the judiciary would have to know, because during that entire time respondent was under a cooperation agreement and the Probation Office knew what he was doing. JA 515.

It is black letter law that when a principal conceals a fraud conviction from his partners and investors, to whom he owes fiduciary duties of self-disclosure, that is constructive fraud. Respondent Doe has been doing that since he pled guilty in 1998. The courts below must know he has been emboldened to continue his frauds, if for no other reason than that his Probation Officer acknowledged **\*24** in the 2004 PSR that Doe's racketeering conviction was being hidden from the firm and his partners, including petitioner's clients. JA 515. The firm's investors, lenders, and insurers have been and continue to be defrauded by this concealment, as petitioner alleged in the civil RICO complaint JA 321. That complaint has been languishing under seal for years because the courts wish to "protect Doe's safety," even though, as argued *infra*, no one has ever produced any evidence that there's even any risk.

Back to the original victims. *Dolan* strongly suggests this Court would hold that sentencing respondent today to that long overdue restitution order would not violate due process. With interest or loss of use, that should be about a $200,000,000 restitution order by now. If that is the case, then every day that the District Court refuses to do so, it violates the law. *Ex Parte United States.*

Finally, how many other defendants have hidden felony convictions? How many licensed professionals are unlawfully maintaining their licenses by failing to disclose a conviction they know is hidden? How many

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

schoolteachers are hiding federal convictions? Doctors? Why is petitioner enjoined from revealing that Doe pled guilty to RICO, and was finally sentenced in October 2009?

The reasons for granting this writ are that there myriad victims, and they are us.

**\*25** B. This Court should put an end to this by holding unconstitutional *per se,* under its existing jurisprudence, any use of sealing orders that violates the separation of powers and the limits of Article III authority.

A criminal trial comes into existence with at least one aspect, even if merely its existence, presumptively open.

By this Court's precedent, any portion of that trial which is presumptively open at inception can only be closed upon the court's finding that one of two tests have been satisfied, a *compelling interest* test or a *countervailing interest test*[FN17].

> FN17. *Press-Enterprise v. Superior Court, 478 U.S. 1 (1986).* Any proceeding to be sealed is first made subject to an "experience and logic" test; if it passes that test, it enjoys a qualified First Amendment right of access that may only be overridden upon the finding of a compelling interest; if it fails, it enjoys a common law right of access subject to countervailing interests. *Gannett v. DePasquale,* 443 U.S. 368 (1979).

By definition, it can never be a compelling or countervailing interest to a presumption of openness (or to anything else) for a court to seek to operate in violation of the law. No court has a constitutionally cognizable interest in operating illegally, without authority, and so no court has a constitutionally cognizable interest in sealing anything such that to do so would bring about an illegal result.

**Direct Illegality I.** As noted, in *Ex Parte United States,* 242 U.S. 27 (1916), this Court held, unanimously, that a court that fails to follow mandatory sentencing laws violates the separation of **\*26** powers and acts illegally, specifically stating that even considerations of humanity (*e.g.*, the health and safety of a

defendant) would not justify a failure to sentence according to law. 242 U.S. at 51.

The obligation to impose a sentence of mandatory restitution, 18 U.S.C. §3663A, is a part of mandatory sentencing law, indeed itself states that the order shall be imposed notwithstanding any other law. *See Dolan, supra.*

Therefore, no order, whether imposed upon satisfaction of a compelling interest or countervailing interest test, which results in a frustration, avoidance, evasion, derogation, or other failure to comply with those laws can be legal.

Whether, and if so to what degree, *Ex Parte United States* applies to other mandatory provisions of sentencing law is to be developed. For example, 18 U.S.C §3553(c) facially requires a statement of reasons be read aloud in open court as part of sentencing. Presumably *United States* is not limited to substantive statutes. Petitioner submits that where Congress has spoken, even if procedurally, in areas which this Court has determined are within Congressional authority to control, by separation of powers sealing may not legally override it.

**Direct Illegality II.** For that matter, nothing in *United States* is married to sentencing law; its logic should apply to anything where Congress has constitutionally restricted what a Court might otherwise have the authority to do.

For example, as noted, n 1790 (one year after the All Writs Act, thus superseding it in the event of any conflict), Congress passed the direct forerunner **\*27** to 18 U.S.C. §1506, App. 3a, which makes it illegal to "take away" or "avoid" any federal court record with the result that a judgment not take effect.

With respect to those rights, to whomsoever applying, created by Congress for which a defendant's final conviction is a condition precedent, no order that frustrates fulfillment of those rights can be legal. The issue is not whether §1506 creates a private right of action for a judicial taking in a situation like the underlying case where the right to sue respondent in civil RICO based on his RICO securities fraud came into existence only upon his final conviction and entry of judgment but is being concealed from his victims; the issue is that it cannot be legal to conceal it.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Indirect Illegality.** Congress has often restricted the equity jurisdiction of the lower courts. It must follow that any sealing order which, facially or as applied, would sufficiently directly cause something to happen which was outside the equity jurisdiction of a court to order directly is also illegal, facially or as applied, without regard to sentencing.

While the precise contours of this concept are outside the scope of this petition, it simply cannot be that a federal court has the equity authority to impose, *or maintain*, a sealing order in the face of actual or chargeable knowledge that the concealment it creates is being used as an instrument of crime or fraud. To sit and do nothing, maintaining a sealing order as is being done here, on respondent's entire criminal case, knowing that he, and others acting in concert with him, are taking advantage of it to continue to defraud others cannot be a lawful action.

**\*28** C. This Court should find an absolute First Amendment right of access to criminal docket sheets, resolving the conflict between the Second and Eleventh Circuits.

This Court has never considered whether such a right of access applies to criminal docket sheets. The first Circuit to take up the issue, the Eleventh, not only found a First Amendment right of access, but found it absolute, not qualified, holding that a sealed proceeding or document not noted on a public docket was an unconstitutional infringement on the public's qualified right of access to criminal proceedings. The right to attend the actual proceedings in question might be qualified, but the right to know they're going on is absolute. *U.S. v. Valenti*, 987 F.2d 708 (11th Cir. 1993).

But the only other Circuit to fully consider the issue, the Second Circuit - while finding a First Amendment right of access to civil and criminal docket sheets - found the right to be *qualified*, going out of its way to note that in "appropriate" circumstances a docket sheet could be sealed. *Hartford Courant v. Pellegrino*, 380 F.3d 83 (2004).

Predictably enough, that is the Circuit at the center of most of the secret criminal cases, like this one, as reported by the *New York Times*. App. 76a.

In the Second Circuit, words and practice diverge. In this case, Judge Glasser has never maintained a public docket since 1998. Yet in denying petitioner's petition for a writ of mandamus, which sought an order directing that Judge Glasser be required to make public the docket of Doe's case, the Second Circuit, *without explanation*, found no **\*29** abuse of discretion in Judge Glasser's failure to do so, even in the complete absence of any findings in the record purporting to satisfy the strict-scrutiny test (and, *a fortiori*, in the complete absence of any actual sealing order). App. 47a.

This Court should follow the Eleventh and find an *absolute* First Amendment right of access to docket sheets, that a sealed or incomplete ("dual") docket sheet is facially unconstitutional. Because of this split of authority between the two circuits, this petition should be granted.

D. This Court should hold the blanket sealing of criminal cases facially unconstitutional.

"Blanket sealing" means a sealing order issued at some time which purports to prospectively adjudicate questions of sealing not yet ripe, thus at one fell swoop purports to authorize the automatic (default) sealing of every subsequent proceeding and record in the case, including the docket, if the sealing order is issued at inception.

This Court has strongly suggested, if not held, that "individualized determinations are always required before the right of access may be denied," *Globe Newspapers v. Superior Court*, 457 U.S. 596, 608 n.20 (1982) (citing *Richmond Newspapers v. Virginia*, 448 U.S. 555, 581 [1980]). Blanket sealing orders are facially unconstitutional as they would override this requirement, and this Court should hold so explicitly. And the "narrowly tailored" component of the strict scrutiny test must *per se* fail if a court blanket seals, "conveniently" not having to **\*30** redact and decide. This petition should therefore be granted, so this issue may be resolved.

E. This Court should clarify the requirements of the "strict scrutiny" closure test.

In practice, strict scrutiny isn't. As Professor Levine

notes in *Toward a New Public Access Doctrine, 27 Cardozo L. Rev. 1739 (2006)*:

Many courts pay lip service to the strict scrutiny test, but seem to stop before giving any real analysis when they find that the pro-closure interests asserted are compelling. ***These courts legitimize closures with unsubstantiated speculation about the harms that public access might cause, making general assumptions*** about the effects of pre-trial publicity or the willingness of participants to be candid, for example, ***without recognizing that what is true as a statistical matter may not be true of a particular case or individual.*** They do not sufficiently explore the measures, short of total closure, that could adequately serve the compelling interests at stake. ***The courts seem especially willing to bow to proclosure interests when closure proponents claim that national security is at stake, and in highly controversial and contentious criminal proceedings.*** The result is that the proceedings in which the public has the most interest are most often the ones that are closed…

**\*31** This is a problem of unparalleled dimension, at least in the Second Circuit. In just one case, little known outside the criminal bar in that Circuit, in 1995 the appellate court held that a district court judge not only need not give any public notice or hold any hearings before sealing an entire criminal trial, he can do so in an organized-crime case solely upon the defendant's uncorroborated claims that he feels at risk, so long as the government does not object. *Astonishingly, the court noted that the district court was free to consider the absence of any evidence of a threat as proof that the secrecy was working. United States v. Doe,* 63 F.2d 84, 87 (1995). One can only imagine how many closures have been justified in the last twenty years by the Second Circuit's invitation to defendants and the government to collude in such an arrangement. As the *New York Times* articles show, this has been the custom and practice in the Second Circuit for at least thirty years.

  **\*32** II. Federal courts may not exempt themselves from the First Amendment on some claim of "judicial privilege." When a stranger to a case lawfully receives copies of sealed documents, whether labeled "PSR" or "XYZ," full prior restraint due process must be provided before he may be enjoined from disseminating them; *New York Times v. United States* applies equally to the dissemination of documents sourced to the judiciary as to the executive or legislative branch.

A. If Ellsberg had clerked for a judge…

*Hypothetical*: A clerk to a federal judge opposes the war in Iraq. Working on a sealed criminal case involving a contractor, he has access to a sentencing memorandum and grand jury minutes. Each reveals the government had early knowledge the war would lead to many times more casualties than admitted.

With the help of a Senator's staff, he makes copies and leaks them to *The New York Times, The Washington Post*, and other newspapers, and mails a copy to an activist attorney. None had any idea until receipt what was coming, though he made clear in each case by cover letter what he had done.

*Question*: Is there some "judicial privilege" found in, or in "penumbras" formed by "emanations" from, the Article III power of a court that it may claim an inherent authority to protect its function and enjoin those recipients from disseminating it absent the *recipients'* proving a compelling need, or must traditional prior restraint due process be followed?

**\*33** Consider first the copies sent to the newspapers. While the individual opinions in *New York Times v. United States,* 403 U.S. 713 (1971), varied, the papers were allowed to publish, immediately. Several comparisons must be made.

First, whatever side of the case, not one Justice cared that they had been stolen:

In resolving that conflict, the attention of every Member of this Court was focused on the character of the stolen document's contents and the consequences of public disclosure. *Although the undisputed fact that the newspaper intended to publish information obtained from stolen documents was noted … **neither the majority nor the dissenters placed any weight on that fact.*** [Emphasis added][FN18] .

> FN18. *Bartnicki v. Vopper,* 532 U.S. 514, 528 (2001)

Second, quoting Justice Brennan:
*The entire thrust of the Government's claim … has been that publication of the material sought to be enjoined "could," or "might," or "may" prejudice*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences* **may** result … there is a single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden … such cases may arise only when the Nation "is at ***34** war" … during which times *"[n]o one would question but that a government might prevent* **actual** *obstruction* to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." … *in neither of these actions has the Government presented or even alleged that publication of items from or based upon the material at issue* **would** *cause the happening of an event of that nature … only governmental allegation and proof that publication* **must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order. In no event may mere conclusions be sufficient.** [Emphasis added]

The Justice states the core tenet of this Court's prior restraint jurisprudence, that at least with core speech, the harm that is said to be threatened must be *imminent* and *catastrophic*, or *clear* and *present*; but whatever words be used to express it, core speech regarding information lawfully obtained may not be enjoined absent some intolerable danger the risk of which is vastly more real than mere conclusion.

This brings the argument full circle. In previous pages, petitioner argued that the misuse of sealing those proceedings and records to which there is a qualified First Amendment right of access can be traced to a "lip service" approach to the "strict scrutiny" component of the *Press-Enterprise II* test.

Concededly, in the jurisprudence of access cases - where a citizen seeks access to governmental ***35** records - it is not entirely clear that "strict scrutiny" is to be applied with such rigor as in prior restraint cases.

But if nothing else, we see the damage to the country that inevitably results where a cherished value, be it access to courts or freedom of speech, is protected by a standard that can be satisfied by a "hunch" or by "the judge's experience" or, worse, by the uncorroborated expression of a subjective fear of a defendant with Alice in Wonderland logic that the *absence* of any

evidence of a threat is itself sufficient.

No Justice of this court would consider the possibility that core speech, truthful speech of public concern revealing, as petitioner would reveal, all that has happened here, and particularly the contents of that PSR[FN19], should be enjoined on Doe's mere assertion that he "feels" at risk, or worse yet, on the District Court's "sense" that there might be such a risk, *a fortiori* in the complete absence of evidence. Yet that's exactly what happened here.

> FN19. No one can doubt the contents of Doe's PSR are core speech. Any discussion of a convicted felon in the context of his crime and sentencing recommendations is core speech, and this PSR (and the other documents) containing evidence of the violation of federal sentencing law is clearly core speech, critical of government misconduct.

An entire criminal case has been hidden for fourteen years. There is no evidence how that came to be, and whatever evidence there is establishes that no test was ever applied.

And what happens? The inevitable in a dual justice system operating in the dark. Illegality. ***36** Deprivation of victims' rights. Judicial misconduct. Prosecutorial misconduct[FN20].

> FN20. The CFR provisions in the appendix show the prosecutor had an obligation to assure victims' rights were protected, and oppose the secrecy of the proceedings. 28 C.F.R. 45.10 & 28 C.F.R 50.9 App. 22a-28a. The failure of the prosecutor to follow the guidelines makes the information in the documents newsworthy.

Then a whistleblower comes along who gets hold of documents in the files of his employer and releases them. What happens next?

Well, if this is 1982, and it's not the government's own misconduct that's at issue, the whistleblower is called a hero. The Solicitor General files an amicus brief and writes that, while the question whether the whistleblower stole them is irrelevant to petitioner's First

Amendment rights…

"Evidence of crime is not the private property of anyone. …. Those who discover it and spread the news … are not guilty of … theft. [T]o the contrary, any effort to disseminate such information is encouraged by the law, while efforts to preserve its secrecy are strictly forbidden…. [P]ublic policy favors its unfettered dissemination…."

That's what the Solicitor General wrote in an amicus brief in *Dirks v. SEC,* 463 U.S. 646 (1983), where a former employee of a company running a massive fraud whose officers were involved with organized crime gave documents to a securities analyst to reveal them.

Petitioner expects the same courtesy here.

**\*37** Until then, look at what did happen here. The District Court issued a permanent injunction on anything in the PSR simply because it was a PSR. No application of the compelling interest test[FN21], just a holding that since it's nearly impossible to access a PSR that you don't already have, you can be ordered to keep quiet about it if you already have it.

> FN21. *Carroll v. Princess Anne,* 393 U.S. 175 (1968).

In other words, if you don't have the right to access it, you don't have the right to reveal it, even if it's dropped in your lap and reveals the misconduct of the same court deciding whether to enjoin you.

As to the other documents, yes, the record shows the District Court issued a finding that their dissemination would prove a grave risk to Doe. Based on what? Who knows, because there's no evidence in the record to support that.[FN22] .

> FN22. In fact the government moved to unseal the docket on March 17, 2011 (App. 118a) because [REDACTED IN ACCORDANCE WITH THE JUNE 25, 2012 ORDER OF THE U.S. SUPREME COURT], but it retracted its motion on January 26, 2012. App. 137a. The change of position is newsworthy in itself.

The Second Circuit upheld the permanent injunction

on the PSR. On what basis? The court said, not surprisingly, that its precedents hold that there was no *right of access* to a PSR absent a showing of compelling need. So petitioner could be enjoined from disseminating one *he already had* unless he could prove a compelling need?

In the same situation, where both grand jury minutes and a sentencing memorandum had leaked to the public, the Third Circuit pointedly noted that it would not even think to try to enjoin those who **\*38** received it, as the First Amendment protected their right to disseminate it. *U.S. v. Smith,* 123 F.3d (1997). This case at bar presents a split of authority, as well as with the Sixth, see *Procter & Gamble v. Bankers Trust,* 78 F.3d 219 (6th Cir.1996) (where the appellate court recognized a clear distinction between a party's *mis*use of *Rhinehart* material as opposed to a non-party's use).

>       B. Petitioner has the same rights as media

In *Bartnicki v. Vopper,* 532 U.S. 514 (2001), this Court held that an innocent recipient of an illegally taped cell phone call could not be punished for disseminating its contents, which revealed possible criminal activity in connection with municipal government, *even though the recipient knew the source had made the tape illegally.* As this Court is aware, that statement is true not only of the defendant broadcaster in that case, but also of the defendant "middleman," a citizen who found the tape in his mailbox and then gave it to the broadcaster.

Then how does one explain why the Second Circuit panel seemed so concerned that petitioner is not organized media? One doesn't. This Court has said just recently:

We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." *Citizens United v. Federal Election Comm'n,* ___ U.S. ___, 130 S.Ct. 876, 905-06 (2010).

**\*39** Our hypothetical activist attorney has the same rights as the *New York Times*, with all respect to Judge Pooler, including freedom of the press, as the term refers to freedom of the printing press vs. oral speech, and like any other citizen of this age, petitioner at the press of a button can make his thoughts known to 50,000,000 people within seconds, 10 times the readership of the paper of record. So long as his speech

does not interfere with an ongoing criminal jury trial in which he is counsel, whether he expresses it by lawsuit in behalf of his clients victimized personally by the underlying facts, or by speechifying, or by any other way, it is his to express.

### CONCLUSION

For all the foregoing reasons, it is most respectfully requested that this petition for a writ of certiorari to the United States Court of Appeals for the Second Circuit be GRANTED.

Roe v. United States of America
2012 WL 3041172 (U.S. ) (Appellate Petition, Motion and Filing )

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Prepared by PrintingHouse Press, Ltd. 10 East 39th Street, New York, NY 10016

Tel No: (212) 719-0990 Fax No: (212) 398-9253

STATE OF NEW YORK          )

COUNTY OF NEW YORK       )  SS

Dave Jackson, Being duly sworn, deposes and says that deponent is not party to the action, and is over 18 years of age.

That on 6/1/2012 deponent caused to be served 1 copy(s) of the within

### Notice of Motion (1) To Order the Docketing and Public Availability of the Petition for Writ of Certiorari in Redacted Form as Provided Herewith and (2) To Caption the Case With the True Name of Richard Roe

upon the attorneys at the address below, and by the following method:

**By Overnight Delivery**

**Office of the Solicitor General**
**950 Pennsylvania Avenue, NW**
**Washington, DC 20530**
**Phone: 202-514-2203**

**By Overnight Delivery**

**Assistant U.S. Attorney Todd**
**Kaminsky**
**271 Cadman Plaza East**
**Brooklyn, NY 11201**
**Phone: 718-254-7000**

**By Overnight Delivery**

**Michael Beys**
**Beys, Stein & Mobargha LLP**
**The Chrysler Building**
**405 Lexington Avenue, 7th Floor**
**New York, NY 10174**
**Phone: 212-387-8200**

**By Email**

**"Jane Doe" and "John Doe II," c/o**
**"Richard Roe" via email, with**
**consent of same.**

**Sworn to me this**

Friday, June 01, 2012

ALLISON R. WADE
Notary Public, State of New York
No. 01WA6191434
Qualified in New York County
Commission Expires 8/11/2016

**Case Name:** USA v. John Doe

**Docket/Case No:** 12-112

**Index:** 10A797

No. 12-112

In the

## Supreme Court of the United States

———————

RICHARD ROE, JANE DOE, JOHN DOE II,

*Petitioners,*

v.

UNITED STATES OF AMERICA AND
JOHN DOE,

*Respondents.*

———————

**On Petition for Writ of Certiorari to the
United States Court of Appeals
for the Second Circuit**

———————

**REPLY BRIEF OF PETITIONERS**

———————

PAUL D. CLEMENT           RICHARD E. LERNER
JEFFREY M. HARRIS          *Counsel of Record*
BANCROFT PLLC             255 West 36th Street
1919 M Street, NW         Suite 401
Suite 470                 New York, NY 10018
Washington, DC 20036      (917) 584-4864
(202) 234-0090            richardlerner@msn.com

*Counsel for Petitioners*

March 5, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ ii

REPLY BRIEF FOR PETITIONERS ......................... 1

I.   Roe's Publication of the PSR is Core
     Speech Protected by the First
     Amendment ........................................................ 3

II.  The District Court's Disregard of
     Victims' Rights Reinforces the Need To
     Vacate the Permanent Injunction ............... 12

CONCLUSION ....................................................... 13

ii

## TABLE OF AUTHORITIES

**Cases**

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) ........................................ 5, 6

*Chase Nat'l Bank v. City of Norwalk,*
    291 U.S. 431 (1934) ............................................ 7

*Citizens United v. FEC,*
    130 S.Ct. 876 (2010) ........................................... 9

*Florida Star v. B.J.F.,*
    491 U.S. 524 (1989) ............................................ 5

*Gentile v. State Bar of Nevada,*
    501 U.S. 1030 (1991) .......................................... 9

*Landmark Communications v. Virginia,*
    435 U.S. 829 (1978) ............................................ 7

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ............................................ 4

*New York Times v. United States,*
    403 U.S. 713 (1971) ....................................*passim*

*Smith v. Daily Mail,*
    443 U.S. 97 (1979) ............................................. 4

*United States v. Aguilar,*
    515 U.S. 593 (1995) ............................................ 9

*Winter v. NRDC,*
    555 U.S. 7 (2008) .............................................. 13

**Statutes & Rule**

15 U.S.C. § 7245 ..................................................... 10

18 U.S.C. § 3663A.................................................... 12

iii

S.Ct. Rule 10(a)............................................................ 3

**Other Authority**

Restatement (Third) of Agency § 8.05 (2006) ............ 6

## REPLY BRIEF FOR PETITIONERS

Respondent John Doe has a long history of defrauding investors in his business ventures. In 1998, he pled guilty to participating in a "pump-and-dump" stock-trading scheme that bilked investors out of more than $40 million. That guilty plea should have signaled the end of Doe's business career and the possibility of restitution for the victims of his crimes. Not so. His entire criminal case was "sealed," leaving past victims and third parties unaware of his conviction.

Doe wasted little time in resuming his old tricks and defrauding new victims. By 2002, he had infiltrated a real estate venture and used it to launder tens of millions of dollars, skim millions more in cash, and once again defraud his investors and partners.

Petitioner Richard Roe is an attorney who represents many of Doe's victims. While preparing a civil RICO complaint against Doe, Roe received—unsolicited—documents from a whistleblower at Doe's company that provided extensive information about Doe's earlier crimes. Those documents included a presentence report ("PSR") from the 1998 case, which revealed that Doe was hiding his previous conviction from his partners in the new firm (an obviously "material" omission). In May 2010, Roe filed the RICO complaint on behalf of Doe's victims in U.S. District Court for the Southern District of New York, with portions of the PSR attached as an exhibit.

2

Instead of taking steps to help Doe's victims recover for their losses, two district courts quickly swung into action to squelch any public reference to the earlier criminal proceedings and to punish *Roe* for disclosing evidence of Doe's crimes. The S.D.N.Y. court sealed the civil RICO complaint four days after Roe filed it. And the E.D.N.Y. court in which Doe was secretly prosecuted issued a temporary restraining order barring Roe from disseminating the PSR and other documents—even though Roe was not a party to that case, and even though the court could not identify any actual sealing or other order that applied to Roe. The court subsequently converted the TRO into a permanent injunction, and the Second Circuit affirmed.

\* \* \*

The procedural history of this case is complicated, but the relevant legal principles are not. This Court has repeatedly held that when a "tipper" provides information to a "tippee" about a matter of public importance, the tippee has an unqualified First Amendment right to publish that information, even if the tipper initially acquired the information through unlawful means. That was true of *The New York Times*' publication of the top-secret Pentagon Papers, *see New York Times v. United States*, 403 U.S. 713 (1971) (*per curiam*), and the Court's holding applies *a fortiori* to the documents at issue here.

Put simply, a federal court has prohibited Roe from disclosing truthful information about a prominent businessman's criminal wrongdoing. The courts below have not only sanctioned an entirely secret criminal proceeding, but have treated the

secret proceeding as a self-executing injunction against the world that precludes Roe from disclosing it as part of an effort to vindicate his clients' rights through civil litigation. And the government considers Roe's actions as tantamount to contempt, even though it cannot identify any court order that Roe actually violated. Roe was not even a party to the secret criminal proceedings and did nothing more than what lawyers are supposed to do when they uncover evidence of misconduct.

This is all a remarkable, flagrant affront to the First Amendment's guarantee of the freedom of expression, and a stark departure from this Court's longstanding jurisprudence. This Court's intervention is clearly warranted. *See* S.Ct. Rule 10(a). Lawyers need to know whether the rules that protect First Amendment tippees apply to them. If so, the decision below is clearly wrong. If not, lawyers will be chilled. Either way, they deserve to know. The Court should summarily reverse the decision below and vacate the permanent injunction, or alternatively grant the petition.

## I. Roe's Publication of the PSR is Core Speech Protected by the First Amendment

The United States (at 11-14) and Doe (at 12-13) rely heavily on cases addressing whether the First Amendment grants a *right of access* to otherwise non-public PSRs. That authority is inapposite. Roe did not need to invoke the First Amendment as a sword to obtain access to Doe's PSR; he already had it, thanks to a whistleblower's unsolicited delivery of that document. JA 185-88, 196. The real First Amendment issue is whether a court can enjoin Roe's

4

*subsequent publication* of the PSR once it was in his possession. Under a long line of this Court's precedent, the answer to that question is an unequivocal "no."

**A.** It is a bedrock principle of First Amendment jurisprudence that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail*, 443 U.S. 97, 102 (1979). If a person lawfully obtains "truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order." *Id.* at 103. And a *prior restraint* on publication is more odious still, as prior restraints "are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

These principles apply with full force even when the information was *initially* obtained unlawfully by a "tipper" or whistleblower. For example, in *New York Times*, 403 U.S. at 714, the government sought to enjoin two newspapers from publishing the "classified" Pentagon Papers. It was undisputed that these documents "were purloined from the Government's possession and that the newspapers received them with knowledge that they had been feloniously acquired." *Id.* at 754 (Harlan, J., dissenting). This Court nonetheless refused to enjoin the newspapers' subsequent *publication* of the documents, holding that the First Amendment fully protected such speech, despite the government's

5

contention that publication would threaten national security. *Id.* at 713-14.

Similarly, *Bartnicki v. Vopper*, 532 U.S. 514, 517 (2001), involved the "intentional disclosure of an illegally intercepted telephone conversation about a public issue." While the *source* of the information—the person who illegally intercepted it—could perhaps be held liable for his conduct, this did not diminish the First Amendment protection afforded to third-party *recipients* of the information. That is, "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535; *see Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989) (First Amendment protects publication of "truthful information which [a newspaper] has lawfully obtained," even if such disclosure violates state law barring publication of rape victims' names).

**B.** In defending the injunction barring Roe from disclosing the contents of Doe's PSR, the United States relies heavily on a purported finding that the whistleblower had "'wrongfully taken'" the PSR and had "'no legal right'" to possess it. U.S. Br. 14-15 (quoting Pet.App.59a). In fact, the district court made no such finding. After a colloquy between counsel over whether the whistleblower had obtained Doe's PSR lawfully, the court stated that it would "reserve" judgment on this issue. JA 268.[1]

---

[1] It is likely that the whistleblower's actions were lawful. *See* Restatement (Third) of Agency § 8.05 (2006), cmt. c (agent may reveal "otherwise privileged information" regarding "the principal's illegal conduct.").

6

Remarkably, the courts below enjoined Roe without regard to whether the whistleblower obtained the PSR lawfully.

The correct rule is the opposite: Roe cannot be enjoined from disclosing the PSR even if the whistleblower obtained it unlawfully, and even if Roe were fully aware of this fact. The legality of *the whistleblower's* conduct is wholly irrelevant to the scope of *Roe's* First Amendment rights. *See New York Times*, 403 U.S. at 713, 754 (newspapers knew they were publishing "classified" documents that had been "feloniously acquired"); *Bartnicki*, 532 U.S. at 519 (defendants "'knew or had reason to know'" that the recording was obtained through an "illegal interception"). Black-letter law demands the vindication of Roe's First Amendment rights.

**C.** The United States asserts that Roe "'knowingly and intentionally flouted a Court order'" by disclosing the PSR. U.S. Br. 14 (quoting Pet.App.134a). Tellingly, however, the government—like the district court and the Second Circuit—fails to identify the "order" that Roe purportedly violated.

The reason for the omission is simple: no such order exists. At the time Roe submitted the PSR as an exhibit to his civil complaint against Doe, *there was no sealing order in place* in Doe's criminal case, much less an order that purported to apply to a complete stranger to that proceeding (like Roe). When an entire criminal case is shielded from the public, it eliminates the need for fastidiousness about what is sealed and who is bound. The district judge was not "able to find any order signed by me, which directed that this case be filed sealed." JA 697; *see*

7

JA 166 ("[T]here is no formal order … with respect to sealing.").

Even if such an order did exist, it could not bind Roe, who was a stranger to the criminal proceeding against Doe. Federal courts have jurisdiction to issue orders operating on the parties to the case and their agents; they do not have the power to enjoin strangers to the case or the world at large. *See Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 437 (1934) (Brandeis, J.) (injunction that extended to "all persons to whom notice of the injunction should come" violated "established principles of equity jurisprudence and procedure"). Indeed, even a *legislature* cannot enact a blanket rule barring third parties from publishing information about "sealed" judicial misconduct proceedings. *See Landmark Communications v. Virginia*, 435 U.S. 829, 837-46 (1978). It follows *a fortiori* that a court cannot—via an *unwritten* order—enjoin publication of "sealed" materials by anyone who happens to receive them, including strangers to the proceeding.[2]

In sum, the district court and the Second Circuit *assumed* that a sealing order existed (even though there is no record of one), *assumed* that such an order would have applied to Roe (even though he was not a party to the case), *assumed* that Roe was fully aware of this hypothetical sealing order, and *assumed* that the requisite factual findings for a prior restraint on

---

[2] *See* JA 702 (district court was "troubled" over "whether an order signed by a judge on one of those sealing envelopes … is binding upon any third-party person").

speech had been made in accordance with due process requirements. Each of those assumptions is highly implausible; the combination of all four is farfetched. The suggestion that Roe "flouted" a court order has a profoundly chilling effect on a lawyer, but is flatly contradicted by the record, and provides no basis for enjoining Roe's efforts to vindicate his clients' rights and "petition the Government for a redress of grievances."

Relatedly, the United States asserts that "Roe had *not* lawfully acquired the sealed material." U.S. Br. 14. But the district court made no such finding of criminal (or even civil) wrongdoing by Roe. Nor could it. The undisputed evidence showed that Roe's receipt of the PSR was "unsolicited" and that the whistleblower "volunteered" this information. JA 196. Roe's conduct was entirely lawful, and was no different from that of the recipients of confidential information in *New York Times*, *Bartnicki*, and *Florida Star*.

**D.** The government suggests (at 15) that Roe was subject to a heightened duty not to disclose the PSR because he is an attorney, as opposed to "a member of the press who acquires material from a source." But that suggestion is extremely problematic and only heightens the need for this Court's review.

This Court has "consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." *Citizens United v. FEC*, 130 S.Ct. 876, 905 (2010). As important as the institutional press is in bringing wrongdoing to light, the role of the bar in fearlessly seeking to redress wrongdoing is equally

vital and equally in need of protection from chilling. There is a reason the First Amendment explicitly and independently safeguards the right to petition along with the freedom of expression and freedom of the press.

To be sure, a lawyer as an officer of the court has special responsibilities when it comes to ensuring compliance with court orders in cases in which that lawyer is involved. For example, the extrajudicial "speech of lawyers representing clients *in pending cases* may be regulated under a less demanding standard." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074 (1991) (emphasis added). Similarly, a judge cannot invoke First Amendment protection if he has "voluntarily assumed a duty of confidentiality" in pending cases. *United States v. Aguilar*, 515 U.S. 593, 605-06 (1995).

But those principles are inapposite here. Roe had no involvement whatsoever in Doe's criminal case— as an attorney or otherwise—and was not subject to any sealing or other order applicable to that case. Indeed, Roe did not even obtain the PSR through court process in the criminal proceeding; he received the PSR, unsolicited, from a whistleblower at Doe's company. JA 185-88, 196. And even if a lawyer has some special responsibility in handling documents prominently marked as subject to a sealing order, that is not the case here. The 49-page PSR contains only a single footnote explaining restrictions on redisclosure that apply to the *Bureau of Prisons*. JA 497.

To the extent Roe's status as an attorney is relevant at all, it only reinforces the need for this

10

Court's review. When lawyers obtain information revealing serious misconduct directed at their clients, they need to know whether they have a First Amendment right to vindicate their clients' rights, a self-executing obligation to return it to some government repository, or a need to remain silent. The answer suggested by this Court's precedents seems crystal clear, but the need for a clear answer could not be more pressing. When the federal government suggests that a lawyer may face criminal liability for engaging in conduct that would be clearly protected by the First Amendment if undertaken by anyone else, further percolation is not in order. The bar needs to know whether filing a civil RICO claim is zealous advocacy in the finest traditions of the profession or sanctionable, even criminal, misconduct.[3]

The government's suggestion that lawyers have diminished First Amendment protection would also lead to absurd results. At least one news magazine obtained Doe's "sealed" criminal complaint and published an article describing the contents of that complaint. Pet.App.73a-75a. It cannot possibly be right that the magazine's actions were laudable investigative journalism while Roe's similar actions were ethical breaches and criminal misconduct. Nor

---

[3] Indeed, attorneys have unique *obligations* to report evidence of criminal misconduct under, for example, the Sarbanes-Oxley Act, 15 U.S.C. § 7245. Yet, under the government's view, reporting criminal misconduct from a "sealed" case would be unprotected by the First Amendment, and perhaps itself a crime.

11

can it be right that the author would have had less First Amendment protection if he had a law degree, as many journalists do.

**E.** Finally, Doe incorrectly asserts (at 12) that it was necessary to enjoin disclosure of the PSR to protect his safety. The 49-page PSR contains exactly three references to Doe's "cooperation agreement," and provides no details about the nature or extent of Doe's cooperation. JA 532, 543-44. And his cooperation has *already* been disclosed to the public through an unsealed letter from the Department of Justice that refers to Doe's "cooperation agreement[]." JA 767-68; *see also* Pet.App.109a-110a (newspaper article stating that Doe cooperated with authorities). The government has also conceded that it "has no information that any person has sought to harm the defendant or his family." SA 66.

A purely speculative concern about Doe's "safety" thus cannot justify a court order barring publication of truthful information about his crimes. *See New York Times*, 403 U.S. at 714 (publication of Pentagon Papers protected by First Amendment, despite asserted threat to national security).

\* \* \*

In sum, Roe is identically situated in all material respects to a journalist who receives information from a whistleblower or other inside source. This Court has repeatedly held that—regardless of the legality of the original source's conduct—the First Amendment bars any attempt to muzzle the *recipient's* disclosure of that information. The permanent injunction barring Roe from disclosing the

12

contents of Doe's PSR is anathema to the First Amendment and must be vacated.

## II. THE DISTRICT COURT'S DISREGARD OF VICTIMS' RIGHTS REINFORCES THE NEED TO VACATE THE PERMANENT INJUNCTION

Because the district court conducted Doe's criminal proceedings in secret, the victims of Doe's pump-and-dump fraud were deprived of their rights under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A. The MVRA *mandates* that full restitution be included in any sentence for racketeering crimes. Yet the district court failed to impose a restitution order requiring Doe to repay the millions of dollars he fraudulently obtained from his victims. *See* Nat'l Org. for Victim Assistance Br. 5-11.

Regardless of whether this issue warrants plenary review, the district court's disregard for the MVRA underscores the importance of vacating the permanent injunction. The victims of Doe's crimes, including a number of Holocaust survivors, have yet to recover any of their lost funds. The district court has left Doe's victims in an untenable position by *both* failing to comply with the MVRA *and* barring the victims' attorneys from relying on documents that would help them recover civil damages.

The balance of equities and the public interest are critical considerations in the analysis of whether to grant injunctive relief, *see Winter v. NRDC*, 555 U.S. 7, 26-32 (2008), and the district court gave short shrift to these factors by failing to consider how the

13

permanent injunction would negatively affect the many victims of Doe's fraud.

## CONCLUSION

The Court should summarily reverse the decision below and vacate the permanent injunction barring Roe from disclosing the contents of Doe's PSR. Alternatively, the Court should grant the petition.

Respectfully submitted,

PAUL D. CLEMENT
JEFFREY M. HARRIS
BANCROFT PLLC
1919 M Street, NW
Suite 470
Washington, DC 20036
(202) 234-0090

RICHARD E. LERNER
  *Counsel of Record*
255 West 36th Street
Suite 401
New York, NY 10018
(917) 584-4864
richardlerner@msn.com

*Counsel for Petitioners*

March 5, 2013